UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

No. 92-4753

UNITED STATES OF AMERICA,
                                              Plaintiff-
Appellee,

versus

JOSEPH NOEL SEALS,
                                              Defendant-
Appellant.

Appeal from the United States District Court
for the Western District of Louisiana

(March 24, 1993)

Before DUHE' and BARKSDALE, Circuit Judges and HUNTER[1], District
Judge.

EDWIN F. HUNTER, JR., District Judge:

On April 20, 1991, Joseph Seals was stopped pursuant to a
routine traffic violation.  A search of the vehicle revealed the
presence of cocaine and a firearm.  This precipitated the
criminal proceedings below.  After trial by jury, defendant was
found guilty on all charges.  He now appeals.  Finding no
reversible error, we affirm.

## Factual Background and Proceedings

On April 20, 1991, Officer Scott of the Shreveport Police
Department was engaged in traffic surveillance on Interstate 20.
Shortly before 1:00 P.M., a vehicle with broken tail lamps and a

---

[1] Senior Judge of the Western District of Louisiana,
sitting by designation.

worn, temporary license tag passed him on the interstate. Since the vehicle, a '78 Buick Regal, was in violation of the state traffic code,[2] Officer Scott signalled for the driver to stop. As Officer Scott approached the auto, its operator, Joseph Seals, climbed out of the vehicle through the driver's side window. Scott asked the operator for his driver's license and registration. He was unable to produce either. The policeman next inquired about the driver's itinerary. Seals responded that he had left Houston at 10:00 P.M. the previous evening, and was heading for an unknown destination in Arkansas. Officer Scott noted that the temporary tag was issued that day, subsequent to Seals' alleged departure from Houston.

Scott's suspicions were aroused. He radioed for a back-up. Scott advised Seals that he was not under arrest, but asked whether he would consider signing a consent to search form. Seals responded that he would not sign a written consent to search, but after a little prodding, granted _verbal_ consent to search his vehicle. Sensing that Seals was not overly enthusiastic about the search, Scott asked again whether Seals _really_ wanted to permit the search. Apparently Seals did have second thoughts. He responded that he did _not_ wish for the officer to search the car.

Meanwhile, a check was run through the police computers, revealing that Seals had been issued a Texas driver's license, which had expired. The check also uncovered that Seals had

---

[2] Louisiana Revised Statutes 32:304, 32:411, and 32:863.1 (1993).

previous convictions for aggravated sexual battery and theft, despite the driver's assurances that his criminal history was limited to traffic citations. As a result of the defendant's inability to produce a valid driver's license, Seals was placed under arrest, and advised of his Miranda rights. He was brought to the police station by the back-up officer.

Approximately thirty minutes after Seals was removed from the scene, Officer McClure arrived with her K-9 unit, "Axel". Officer Scott had requested a K-9 officer due to the suspicious circumstances surrounding Seals' vehicle, and his inconsistent responses to questioning.

The K-9 unit sniffed the exterior of the car, but did not alert. However, the dog jumped up on the driver's side window;[3] and this was interpreted as an alert on the interior of the vehicle by Officer McClure. The K-9 unit was then placed into the passenger compartment, where he alerted on the ashtray and an area between the front seats. Pursuant to this additional alert, Officer McClure located and retrieved a glass pipe containing cocaine residue.

Once in the passenger compartment, the officer noticed that the back seat had been modified, so that a piece of plywood could be raised allowing access to the trunk area. Officer McClure raised the plywood permitting her to peer into the trunk, where she discovered a loaded .22 caliber, Marlin rifle. Next, the K-9 unit

---

[3] The driver's side window remained partially open. The officers rolled up the window as far as possible from the outside, since the car door would not open.

3

was placed in the trunk. He alerted upon a liquor box. McClure opened the box, and found a plastic bag containing 14 smaller plastic bags of crack cocaine.

A grand jury indicted Seals on three charges: (1) possession of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1); (2) carrying a firearm, a Marlin, model 60, .22 caliber rifle, during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1); and (3) possession of a firearm by a previously convicted felon, 18 U.S.C. § 922(g)(1).

On February 3, 1992, the charges against defendant were dismissed for violation of the speedy trial act. However, the identical indictment was simply refiled against the defendant, and all motions argued under the first indictment were carried over into the second.[4] On March 30 and 31, 1992, the defendant was tried by jury. However, a mistrial was granted after the jury was unable to reach a verdict. On April 20, 1992, the defendant was retried and found guilty on all three charges. He was sentenced to 250 months in prison.

On appeal, the defendant raises several issues for consideration: (1) that the search of his vehicle violated his Fourth Amendment rights, and consequently, any evidence found should have been suppressed; (2) that two potential jurors were peremptorily challenged by the prosecution on the basis of race in violation of Batson; (3) that the trial judge should have granted a mistrial after a witness referred to defendant's prior trial and

---

[4] Including the motion to suppress.

4

motion to suppress hearing; (4) the trial judge erred in refusing to issue a proposed jury instruction that in order for a firearm to be "carried" pursuant to a drug trafficking crime, the weapon had to be within "easy reach"; and (5) it was necessary for the prosecution to "point out" or identify the defendant in the courtroom as an indispensable element of its case.

## I. THE MOTION TO SUPPRESS

On October 21, 1991, the magistrate conducted a hearing on defendant's motion to suppress the evidence found in the vehicle. The magistrate heard testimony from Officer Scott, the arresting officer, Officer Fletcher, and Officer McClure, the K-9 officer. He ruled that Scott had reasonable suspicion to initially stop defendant, and then upon learning that the defendant had no driver's license, probable cause existed to arrest the defendant.[5] The magistrate further held that the "sniff" by the K-9 unit was justified as a search incident to arrest. Moreover, the magistrate specifically found that the K-9 unit's attempt to jump into the vehicle constituted an alert, which in turn provided probable cause that narcotics were within the vehicle. The magistrate concluded that under California v. Acevedo, 111 S.Ct. 1982 (1991), once an officer obtains probable cause to search a vehicle, then probable cause exists to search all compartments of the vehicle and all containers.

Finally, as an independent ground for admitting the evidence,

_____

[5]  These findings are not disputed.

5

the magistrate concluded that the evidence would have been inevitably discovered pursuant to a valid inventory search of the vehicle. The magistrate's findings were adopted by the trial judge. We review a district court's findings of fact on a motion to suppress under the clearly erroneous standard, and will review the court's ultimate determination of Fourth Amendment reasonableness de novo. United States v. Colin, 928 F.2d 676 (5th Cir. 1991); United States v. Harrison, 918 F.2d 469 (5th Cir. 1990).

> While we review questions of law de novo `[i]n reviewing a trial court's ruling on a motion to suppress based on live testimony at a suppression hearing, the trial court's purely factual findings must be accepted unless clearly erroneous, or influenced by an incorrect view of the law, and the evidence must be viewed most favorabl[y] to the party prevailing below.'

United States v. Ibarra, 965 F.2d 1354, 1356 (5th Cir.); reversed on other grounds, 966 F.2d 1447 (5th Cir. 1992) (citations omitted).

The magistrate stated that the original "sniff" conducted by the K-9 unit was permissible under the search incident to an arrest exception to the warrant cause. We express certain misgivings as to whether the "sniff" could be considered a search incident to an arrest in light of the fact that the defendant had already been arrested, handcuffed, and removed from the scene at least thirty

minutes before the search took place.[6]   In any event, it is unnecessary to justify the search as one conducted incident to an arrest.   A dog "sniff" is not a search.   United States v. Hernandez, 976 F.2d 929 (5th Cir. 1992); United States v. Gonzalez-Basulto, 898 F.2d 1011, 1013 (5th Cir. 1990);   United States v. Place, 462 U.S. 696 (1983).  Furthermore, the officers did not need reasonable suspicion as a prerequisite to the dog sniff.   United States v. Goldstein, 635 F.2d 356 (5th Cir.), cert. denied, 452 U.S. 962 (1981).

> We hold that the dog sniff, under these circumstances, is not a `search' within the meaning of the Fourth Amendment and therefore an individualized reasonable suspicion of drug-related criminal activity is not required when the dog sniff is employed during a lawful seizure of the vehicle.

United States v. Morales-Zamora, 914 F.2d 200 (10th Cir. 1990), reversed on other grounds after remand, 974 F.2d 149 (10th Cir. 1992).

In the case sub judice, the dog, "Axel", was led around the car, but did not alert on the exterior of the vehicle.   Instead, Axel jumped up on the driver's side window.   The dog's handler,

---

[6]   See Belton, where the Supreme Court held that, "when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile." New York v. Belton, 453 U.S. 454 (1981).   In United States v. Vasey, where defendant was arrested and placed in the rear of a squad car for thirty to forty-five minutes before the search of the vehicle, the Ninth Circuit concluded that the search was not conducted contemporaneously with arrest.   United States v. Vasey, 834 F.2d 782 (9th Cir. 1987); But see, United States v. White, 871 F.2d 41 (6th Cir.); affirmed after remand, 892 F.2d 1044 (6th Cir. 1989).

interpreted this as an alert.[7] The trial court held that once the dog alerted that there were drugs present, this gave the officers probable cause to search inside.[8]

It is well established that warrantless searches of automobiles are permitted by the Fourth Amendment if supported by probable cause. See United States v. Ross, 456 U.S. 798 (1982).

"'Probable cause determinations are not to be

---

[7] During the motion to suppress hearing, a discrepancy was noted between Officer McClure's oral testimony and her written report filled out shortly after the incident. In Officer McClure's written report, she stated that Axel did not alert on the exterior of the vehicle, but attempted to jump inside. At the hearing, she testified that the dog alerted when he jumped up on the driver's side of the vehicle. The magistrate questioned her concerning this inconsistency. She responded that when she wrote that the dog did not alert, she meant that he did not alert on the exterior of the vehicle, but he did alert on the interior when he jumped up on the driver's side window. The magistrate accepted this explanation and, was in the best position to assess its credibility. We do not find this determination clearly erroneous.

[8] The Supreme Court has made a distinction between probable cause to believe that drugs are in a particular section of the car, and probable cause to believe that drugs are generally within the car. In Ross, the Court stated, "probable cause to believe that a container placed in the trunk of a taxi contains contraband or evidence does not justify a search of the entire cab." United States v. Ross, 456 U.S. 798, 824 (1982). Whereas on the next page, the Court states, "if probable cause justifies a search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." Id. Thus, if officers have probable cause to believe that contraband is in only one part of a car, then they are limited to that area. If, on the other hand, officers have probable cause to believe that contraband is located somewhere in a car, but they don't know exactly where, then they can search the entire vehicle. Since it was never explained whether the initial alert by the dog encompassed the entire area of the car including the trunk, we will consider that the alert only applied to the passenger compartment. Subsequently, when the glass pipe with cocaine was discovered, the officer had probable cause to search the entire car. (See discussion infra.)

8

made on the basis of factors considered in isolation, but rather on the totality of the circumstances.' <u>United States v. Reed</u>, 882 F.2d 147, 149 (5th Cir. 1989). `The factors relevant to probable cause are not technical ones, but rather factual and practical ones of everyday life on which reasonable and prudent persons, not legal technicians, act.' <u>Id</u>. (quoting <u>United States v. Tarango-Hinojos</u>, 791 F.2d 1174, 1176 (5th Cir. 1986))"

<u>United States v. Kelly</u>, 961 F.2d 524 (5th Cir. 1992),[9]

Upon entering the passenger compartment, Axel alerted on an area in between the front seats, which revealed a glass pipe with cocaine residue. Officer McClure noticed that the rear seat area had been modified to allow access to the trunk. The discovery of cocaine residue, in conjunction with the defendant's nervousness and false answers, coupled with the modification of the rear seat, provided the officers with probable cause to believe that additional drugs were contained within the vehicle. Since they did not know exactly where in the car the drugs were located, the officers had probable cause to search the entire vehicle. <u>Ross</u>, <u>supra</u>; <u>United States v. Reed</u>, 882 F.2d 147, 149 (5th Cir. 1989). Finally, the officers were justified in opening the liquor box containing cocaine, due to their probable cause to believe that drugs were located in the car, which extended to the entire vehicle and all containers found therein. <u>Ross</u>, <u>supra</u>; <u>California v. Acevedo</u>, 111 S.Ct. 1982 (1991).

Moreover, the record conclusively reveals that the evidence

---

[9] "A warrantless search of an automobile is permissible where . . . officers have probable cause to believe the vehicle contains contraband." <u>United States v. Bustamante-Saenz</u>, 894 F.2d 114, 117 (5th Cir. 1990), (citation omitted).

9

would have been discovered pursuant to an authorized inventory search. An inventory search is valid, provided it is conducted under an established police department inventory policy. United States v. Walker, 931 F.2d 1066 (5th Cir. 1991).

> An inventory search is a routine administrative procedure designed to effect three distinct purposes: protection of the owner's property which may be stored in the vehicle; protection of the police against claims of lost, stolen or vandalized property; and protection of the police from potential danger. South Dakota v. Opperman, 428 U.S. 364 (1975). When the police acquire temporary custody of a vehicle, a warrantless search of the vehicle does not offend Fourth Amendment principles so long as the search is made pursuant to `standard police procedures' and for the purpose of `protecting the car and its contents'. Id. at 372, 373.

United States v. Lugo, 978 F.2d 631 (10th Cir. 1992).

This circuit and several other circuits recognize that evidence which was originally obtained improperly should not be suppressed, provided that it would have been legitimately uncovered pursuant to normal police practices. United States v. Namer, 835 F.2d 1084 (5th Cir.), cert. denied, 86 U.S. 1006 (1988); United States v. Brookins, 614 F.2d 1037 (5th Cir. 1980); United States v. George, 971 F.2d 1113 (4th Cir. 1992); United States v. Horn, 970 F.2d 728 (10th Cir. 1992). This exception is known as the "inevitable discovery" doctrine. Namer, supra.

The record reveals that prior to the search conducted by Officer McClure and the K-9 unit, Officer Scott had already decided to impound the vehicle, and had begun the necessary paperwork. A copy of the Shreveport Police Department's inventory procedure was placed into evidence at the motion to suppress hearing. The

10

inventory procedures require the officer to search an impounded vehicle, including the trunk, in order to locate and identify valuable property.[10]  We also note that to comply with the department's policy of locating valuable property, it is necessary for the officer to open any containers found inside the vehicle. We conclude that the rifle and crack cocaine would have been inevitably discovered during the normal inventory procedures of the Shreveport Police Department.  Defendant's motion to suppress was properly denied not only as a result of the officers' probable cause to search the vehicle, but also under the inevitable discovery rule.

## II. THE BATSON CHALLENGE

During voir-dire, the government exercised two of its seven peremptory challenges to remove two black potential jurors from the jury pool.  Immediately following jury selection, the defendant, a black male, argued that the prosecution's peremptory challenges were racially motivated and deprived him of equal protection rights as articulated in Batson v. Kentucky, 476 U.S. 79 (1986).

The prosecution justified its actions on the grounds that the

_____

[10]  The procedures provide in part:
"F.  The member shall conduct an inventory of the impounded vehicle.  In doing so, the officer shall:
1.  completely inventory the contents of the vehicle, including the trunk, in order to determine the presence and location of valuable property in the vehicle at the time it comes under the control of the Department."
Shreveport Police Department Procedure Number 502.1.

primary activities of one of the challenged jurors consisted of reading the Bible and watching television; whereas the other juror worked with the mentally retarded. The Assistant U.S. Attorney, a black male himself, stated that he felt that the challenged jurors' emphasis on reading the Bible and helping the handicapped would make them more lenient and sympathetic towards the defendant. Although, there were other white jurors with similar religious and community-oriented activities, the prosecutor, when questioned, felt that those jurors would not have been reached in the selection process.

The district judge bluntly asked the prosecutor, "As an officer of the court, as a representative of all the citizens of this country and of the government, I'm asking you, did you challenge these two because they were black?" The prosecutor answered, "No, I did not, your Honor". He added, "As a matter of fact, when the defense counsel raised the issue, I couldn't remember which jurors were black." The district judge made a specific ruling based upon his past experience with the U.S. Attorney's Office, and in particular, his previous contact with this prosecutor. He stated: "I'm going to in view of past history, and dealing with the United States Attorney's Office and in dealing with Mr. Smith, I accept his explanation and find that the strikes were non-racially motivated."

At trial, proof of a <u>Batson</u> claim is a three-step process. First, the defendant must make a prima facie showing that the prosecution exercised peremptory challenges on the basis of a

12

juror's cognizable racial background.  Second, the burden shifts to the prosecution to articulate a race-neutral explanation for removing the juror in question.  Finally, the trial court must determine whether the defendant has met his burden of proving purposeful discrimination.  Hernandez v. New York, 111 S.Ct. 1859, 1866 (1991);  Polk v. Dixie Ins. Co., 972 F.2d 83 (5th Cir. 1992); cert. denied, 113 S.Ct. 982 (1993).  The determination of the trial judge is accorded great deference, and is reviewed under a "clearly erroneous" standard.  Hernandez v. New York, 111 S.Ct. at 1869; Polk v. Dixie Ins. Co., 972 F.2d 83, 85 (5th Cir. 1992);  United States v. Lance, 853 F.2d 1177 (5th Cir. 1988).[11]

The trial judge had dealt previously with this prosecutor, and was in the best position to gauge his credibility.[12]   In this

---

[11]   The Supreme Court noted,
> Deference to trial court findings on the issue of discriminatory intent makes particular sense in this context because, as we noted in Batson, the finding will `largely turn on evaluation of credibility.'  476 U.S. at 98, n.21.  In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed.  There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies `peculiarly within a trial judge's province.'

Hernandez v. New York, 111 S.Ct. at 1869. (citations omitted).

[12]   In United States v. Lance and United States v. Mixon, we found no Batson violation despite the presence of white jurors with similar disqualifying characteristics as the challenged black jurors.  United States v. Lance, 853 F.2d 1177 (5th Cir. 1988); United States v. Mixon, 977 F.2d 921 (5th Cir. 1992).  The

13

regard, not only did the trial judge investigate the prosecutor's race-neutral explanations, he also stated his personal knowledge and experience concerning the prosecutor's honesty and integrity. Under these facts, we cannot say that the trial judge was clearly erroneous in his determination that there was no violation of the defendant's equal protection rights. Seals' <u>Batson</u> challenge is rejected.

## III. REMAINING ISSUES

A.  <u>Reference to Prior Trial</u>

Appellant alleges that he was prejudiced at trial when a government witness briefly and inadvertently referred to the defendant's previous trial and a prior motion to suppress hearing.[13]   The allegedly prejudicial references were responses

---

result was reached in each of these cases as a consequence of additional factors which were peculiarly suited to the judge's credibility assessment.

[13]  The alleged prejudicial reference surfaced during an exchange between the prosecutor and Officer Scott in furtherance of the government's effort to establish the chain of custody of the seized cocaine.  The interplay provided in part,

    Q.   And did there come a time when you retrieved
         them from the crime lab?

    A.   Yes, sir, I did.  I picked them up at the
         crime lab for the <u>motion to suppress hearing</u>
         and did bring them to court and then turned
         them back into the police property room after
         that hearing.

    Q.   And did there come a time when you turned
         these items over to the U.S. Attorney's
         office?

by Officer Scott made pursuant to a valid evidentiary function - to establish the chain of custody of the seized cocaine. Officer Scott's responses were merely an attempt to account for the evidence while it remained in his possession. United States v. Wilson, 922 F.2d 1336 (7th Cir.), cert. denied, 112 S.Ct. 155 (1991).

Moreover, we emphasize that the trial judge offered to instruct the jury to disregard the reference. Potentially prejudicial evidence may be cured, or admitted for a narrowly drawn purpose, through the issuance of appropriate limiting instructions. United States v. Gordon, 780 F.2d 1165, 1174 (5th Cir. 1986). Counsel for the defendant[14] refused the offer, undoubtedly under the belief that any further emphasis would only serve to heighten the jury's awareness of the potentially prejudicial reference. Having chosen to refuse a jury instruction addressing the inadvertent utterance, defendant cannot now complain that one should have been given.

B.  Inadequate Jury Charge

Defendant contends that in order to be convicted of using and carrying a firearm during a drug offense in violation of 18 U.S.C.

---

A.  Yes, sir I turned them over to the U.S. Attorney's office on the last trial date.

Q.  Would that have been March 30?

A.  Yes, sir, that is correct.
(emphasis added)

[14]  The same counsel which now effectuates this appeal.

§ 924(c), the firearm must have been within the defendant's immediate reach at the time of the offense. U.S. v. Feliz-Cordero, 859 F.2d 250 (2d Cir. 1988). The standard Fifth Circuit jury instruction was given. Defendant's additional instruction would impose an additional burden on the government, not recognized by this Circuit. See U.S. v. Pineda-Ortuno, 952 F.2d 98 (5th Cir. 1992), cert. denied, by Ramirez-Carranza v. U.S., 112 S.Ct. 1990 (1992). Our decisions uniformly hold that it is not necessary for the defendant to actually brandish or "use" the firearm at the time of arrest, merely that the firearm is available for "use", or is in position to provide protection in connection with a drug trafficking crime. U.S. v. Cannon, 981 F.2d 785, 790 (5th Cir. 1993); U.S. v. Beverly, 921 F.2d 559, 562-563 (5th Cir. 1991), cert. denied, by Brown v. United States, 111 S.Ct. 2869 (1991); U.S. v. Molinar-Apodaca, 889 F.2d 1417, 1424 (5th Cir. 1989).

The district court properly instructed the jury.

C. Failure to "Point Out" Defendant

Defendant argues that as an indispensable element of the government's case, it was necessary for a witness to actually "point out" the defendant in the courtroom. The short answer to this contention is that it has no merit whatsoever. The case law is that it suffices to establish identity by "inference and circumstantial evidence." U.S. v. Royals, 777 F.2d 1089 (5th Cir. 1985); Delegal v. U.S., 329 F.2d 494 (5th Cir.), cert. denied, 379 U.S. 821 (1964).

No one argues that Seals was not the perpetrator of the

16

offenses.  His identity was never questioned during the trial. Nevertheless, we do note that:  1) Seals was charged as a previously convicted felon, and stipulated to this fact; 2) many references were made to Joseph Noel Seals and the "defendant" interchangeably throughout the trial, without objection; 3) a forty-five minute video tape of the defendant's arrest was shown to the jury; and 4) defendant's counsel stated, "the defendant, Mr. Seals," when referring to a scene in the video tape.  As the trial judge stated to defense counsel after denying his motion on this issue - "Nice Try"!

The judgment of the trial court is AFFIRMED.