UNITED STATES of America, Plaintiff,

v.

Gabriela ESPINOZA–SANTILL, Defendant.

No. P–96–CR–95.

United States District Court, W.D. Texas, Pecos Division.

April 17, 1997.

---

James K. Blankinship, Asst. U.S. Atty., Alpine, TX, for the Government.

Elizabeth Rogers, Asst. Fed. Public Defender, El Paso, TX, for Defendant.

## ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

FURGESON, District Judge.

Currently pending before the court is Defendant's Motion to Suppress Evidence. A hearing on the Motion was held in Pecos, Texas on March 12, 1997. Having considered the oral arguments, and the relevant case law, the court is the opinion that the Motion should be denied.

### 1. BACKGROUND

On the morning of December 9, 1996, Border Patrol Agent Ronald Garcia was traveling east in a marked Border Patrol vehicle on O'Reiley Street in Presidio, Texas. At the edge of town, O'Reiley Street turns into Farm–to–Market (FM) Road 170, which runs parallel to the Rio Grande in the direction of Big Bend National Park. Roughly in the center of town, U.S. Highway 67 begins its northeasterly trek towards Marfa, Alpine and Dallas. The southern tip of Highway 67 abuts O'Reiley Street. Traffic traveling east-west on O'Reiley Street must yield to traffic turning onto Highway 67 from either

direction. As Agent Garcia approached the turn-off point, he noticed a 1982 Chevrolet van traveling towards him. The van slowed down, seemingly to permit Agent Garcia to make his left turn onto Highway 67, and then inexplicably sped up, nearly colliding with the Border Patrol vehicle.

Agent Garcia had to brake sharply in order to avoid a collision. The Chevrolet van proceeded west on O'Reiley Street. Not having recognized the van nor the driver, Agent Garcia decided to turn around and run a license plate check on the vehicle. At the time of the near collision, Agent Garcia was able to notice only that there were two occupants and that the driver was a Hispanic female. Agent Garcia began following the van west on O'Reiley and noticed that it had pulled into a closed gas station. It was around 6:50 in the morning and all of the gas stations in Presidio were closed. A license check of the vehicle revealed that it was registered to an individual in El Paso, Texas. As the Agent neared the parked van, the van abruptly left the gas station and began traveling east on O'Reiley towards the intersection of Highway 67. Agent Garcia likewise turned around and continued to follow the van. The van, indeed, turned north onto Highway 67 and Agent Garcia did likewise. Then something very peculiar happened. While the Agent had not turned on his lights to signal for the van to pull over, the van slowed down and began driving on the shoulder of the road. After about half a mile or so of such driving, Agent Garcia turned on his lights to signal for the van to pull over. The van did not immediately pull over, but continued to hug the shoulder for another one-half mile until it reached the parking lot of the Three Palms Motel, at which point it came to a complete stop.

Agent Garcia testified at the suppression hearing that his reason for deciding to pull the vehicle over was to check the citizenship status of its occupants. Several factors made the Agent suspect that the car's occupants may be in the country illegally, even though the vehicle bore Texas license plates. First, the Agent suspected that the occupants may be from out of town when they slowed down to make the turn onto Highway 67, overshot it, and then accelerated, oblivious to the yield sign directing traffic. Second, all local residents would know that gas stations in Presidio were closed at that time of the morning. Next, Agent Garcia became most suspicious when the van suddenly departed the gas station as soon as his Border Patrol vehicle came into clear view. Finally, Defendant's erratic driving behavior with a Border Patrol vehicle in tow, i.e. driving on the shoulder of the highway when the Agent had not signaled for the van to pull over, made the Agent suspect that something illegal was afoot.

Prior to the time the Chevrolet van came to a complete stop, Agent Garcia had radioed for assistance from the Sheriff's Department. A sheriff's deputy arrived at the Three Palms Motel almost immediately. After the van had stopped, Agent Garcia approached the driver's side window and asked the driver, Defendant in the case at hand, to produce documentation evidencing her right to be in the United States. Defendant produced a tattered naturalization certificate for herself, but could not produce one for her companion, whom the Defendant said was her 15 year old niece. The Agent found that representation to be somewhat suspicious, since the passenger looked much older than fifteen. In fact, the passenger turned out to be 21, and was not in any way related to the Defendant. After Agent Garcia had checked Defendant's naturalization certificate, the sheriff's deputy asked for her to provide a driver's license and proof of insurance. She had neither.

By this time, Agent Garcia had noticed that the van's tires and the lower portion of its body had fresh mud on them, a sign of an illegal river crossing. Agent Garcia testified that at various points along the border, the Rio Grande was so shallow that there were mud banks along which cars could pass from Mexico into the United States. The Agent, personally, had made numerous apprehensions of individuals who had made illegal crossings in just such a manner. When Defendant was asked about the fresh mud on the tires of her van, she volunteered that the van had crossed the Rio Grande sometime earlier that morning at a point 10–20 miles

east of Presidio. She later changed her story and said that the van had crossed at a different point along the river. Agent Garcia testified that there are certain unmanned border crossings along the U.S.-Mexico border, and that individuals using those crossings are required to report to a Border Patrol station, such as the one in Presidio, to undergo customs and immigration checks. While that is the way things are supposed to work in theory, Agent Garcia conceded on cross-examination that that was not how things were usually done; that more times than not, individuals crossing at these unmanned border posts did not report to manned Border Patrol stations. The van Defendant was driving, however, had not crossed at an unmanned post, but had simply crossed the river at a low water spot.

Because Defendant had admitted to the Agent that the van had illegally crossed the river, a drug sniffing canine was called to the scene. The dog failed to alert to the presence of any narcotics. Nevertheless, the van was driven back to the Border Patrol station where another dog was called. This time the animal alerted to the presence of drugs and, sure enough, 212 packets of marijuana were discovered on board.

Defendant has moved to have evidence of the drugs suppressed, arguing that they were seized in violation of her Fourth Amendment rights. Defendant first argues that the initial stop was illegal because the Agent did not, in fact, have reasonable suspicion that something illegal was afoot. Alternatively, Defendant argues that if the initial stop was legal, the subsequent search exceeded the scope of the stop. In other words, argues the Defendant, that as soon as she produced her naturalization certificate, she should have been immediately released and not questioned further without having been read her *Miranda* rights. The government, on the other hand, argues that Agent Garcia did have reasonable suspicion to effectuate the stop. In the alternative, argues the government, the stop occurred at the border or at its functional equivalent. While the court finds that the stop occurred neither at the border nor at its functional equivalent, it nevertheless holds that, under the totality of

the circumstances, Defendant's actions did give rise to a reasonable suspicion that Defendant was in the country illegally or was transporting illegal aliens. The court also finds that the Agent's post-stop inquiry did not exceed the scope of the stop and that there was probable cause to require that the van be brought to Border Patrol headquarters for a more thorough search, even after the first canine failed to alert to the presence of drugs.

## 2. FOURTH AMENDMENT ANALYSIS

### A. Fourth Amendment Bars Only Unreasonable Searches

The Fourth Amendment to the United States Constitution provides in pertinent part that

> [t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause. . . .

The Fourth Amendment bars only *unreasonable* searches and seizures. *See United States v. Pierre,* 958 F.2d 1304, 1308 (5th Cir.1992); *United States v. Brignoni–Ponce,* 422 U.S. 873, 877, 95 S.Ct. 2574, 2578, 45 L.Ed.2d 607, 614 (1975) (holding that the Fourth Amendment applies to seizures that involve only a brief detention short of traditional arrest); *Davis v. Mississippi,* 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969). The reasonableness inquiry is driven by a balancing of " 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." ' *Pierre,* 958 F.2d at 1308–09 (citing *New York v. Class,* 475 U.S. 106, 118, 106 S.Ct. 960, 968, 89 L.Ed.2d 81 (1986)); *see also Delaware v. Prouse,* 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1983). However, the intrusiveness of the search is not measured so much by its scope as by whether it invades an expectation of privacy that society is prepared to recognize as "reasonable." *Pierre,* 958 F.2d at 1309 (citing *Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967)). The exclusionary rule, as it has developed under

the Fourth Amendment, provides that evidence obtained in violation of an individual's Fourth Amendment rights may not be introduced against him at trial. *See Wong Sun v. United States,* 371 U.S. 471, 484, 83 S.Ct. 407, 415–16, 9 L.Ed.2d 441 (1963). For the most part, courts look askance at any searches conducted without a warrant. The Supreme Court has determined that warrantless searches and seizures are per se unreasonable unless they fall within a few narrowly defined exceptions. *United States v. Cardenas,* 9 F.3d 1139, 1147 (5th Cir.1993) (citing *Coolidge v. New Hampshire,* 403 U.S. 443, 454–55, 91 S.Ct. 2022, 2031–32, 29 L.Ed.2d 564 (1971)). The exceptions include searches on the basis of probable cause or consent.

### B. Automobile Stops Require Probable Cause or, in some instances, Reasonable Suspicion

There is no question but that the stopping of an automobile by a police officer is a seizure within the meaning of the Fourth and Fourteenth Amendments. *Brower v. County of Inyo,* 489 U.S. 593, 596–97, 109 S.Ct. 1378, 1381, 103 L.Ed.2d 628 (1989); *Delaware v. Prouse,* 440 U.S. 648, 653, 661, 99 S.Ct. 1391, 1396, 1400, 59 L.Ed.2d 660 (1979); *United States v. Shabazz,* 993 F.2d 431, 434 (5th Cir.1993); *United States v. Thomas,* 787 F.Supp. 663, 669 (E.D.Tex.1992). A vehicle may lawfully be stopped (with one major exception, pertinent only in the border area) by a law enforcement officer only when there is probable cause to stop the vehicle or, lacking probable cause, when the officer has a reasonable suspicion supported by articulable facts that criminal activity "may be afoot." *See United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1, 10 (1989); *United States v. Brignoni–Ponce,* 422 U.S. 873, 881, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975); *United States v. Breeland,* 53 F.3d 100, 102 (5th Cir.1995); *United States v. Tellez,* 11 F.3d 530, 532 (5th Cir. 1993) (citing *Terry v. Ohio,* 392 U.S. 1, 21–22, 88 S.Ct. 1868, 1879–80, 20 L.Ed.2d 889). The latter type of stop is often referred to as an investigative or *Terry* stop. *See Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *United States v. Cooper,* 43 F.3d 140, 145 (5th Cir.1995). According to *Terry,* even in the absence of probable cause, police may stop persons and detain them briefly in order to investigate a reasonable suspicion that such persons are involved in criminal activity. *United States v. Tapia,* 912 F.2d 1367, 1370 (11th Cir.1990). Such criminal activity includes traffic violations, however minor. *See Pennsylvania v. Mimms,* 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (per curiam) (stop for expired license plate); *United States v. Kelley,* 981 F.2d 1464 (5th Cir.1993) (stop for seatbelt violation); *Breeland,* 53 F.3d at 102; *Thomas,* 12 F.3d at 1366; *United States v. Shabazz,* 993 F.2d 431, 434–35 (5th Cir.1993); *United States v. Bloomfield,* 40 F.3d 910, 915 (8th Cir.1994).

While this discussion, regarding when law enforcement officers can make an investigatory stop, is generally applicable to Border Patrol agents, one point merits clarification. The enforcement powers of Border Patrol agents are clearly set out in 8 U.S.C. § 1357. Under subsection (5), agents are given general powers to make arrests

(A) for any offense against the United States, if the offense is committed in the officer's present, or

(B) for any felony cognizable under the laws of the United States, if the officer has reasonable grounds to believe that the person to be arrested has committed or is committing such a felony,

if the officer or employee is performing duties relating to the enforcement of the immigration laws at the time of the arrest and if there is a likelihood of the person escaping before a warrant can be obtained for his arrest.

What this means, then, is that Border Patrol agents are not authorized to enforce the laws of the various states in which they operate, such as speeding laws, for instance. If a vehicle is traveling one mile an hour over the posted speed limit, a state trooper would be clearly justified in pulling it over, even though the trooper is really making the stop on a suspicion that drugs may be on board. As the Supreme Court held last session in *Whren v. United States,* —— U.S. ——, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), the officer's subjective intent is irrelevant, so long

as there are objective factors justifying the stop. In the Border Patrol context, while an agent cannot stop a vehicle for speeding, the speed at which a vehicle is traveling, as perceived by the agent, may be one of the factors, albeit one of the less important ones, considered by that agent in deciding whether reasonable suspicion exists to make the stop. Such is the situation in the case at hand. A police officer who clocks the Defendant for speeding, or for driving erratically, could pull her over on that basis alone. A Border Patrol agent who perceives the Defendant traveling at a "high rate of speed," needs to be aware of several more factors before he can effectuate the stop of the vehicle.

Probable cause means "a fair probability that contraband or evidence of a crime will be found," *Sokolow,* 490 U.S. at 7, 104 L.Ed.2d at 10; *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983), and the level of suspicion required for a *Terry* stop is obviously less demanding than that for probable cause. *See United States v. Montoya de Hernandez,* 473 U.S. 531, 541, 544, 105 S.Ct. 3304, 3310–12, 87 L.Ed.2d 381 (1985). If the officer is legally authorized to stop the driver, his actual intent or motivation does not invalidate the stop. *Bloomfield,* 40 F.3d at 915. Although *Terry* involved the seizure of an individual, its rationale has been extended and consistently applied to vehicle stops. *See, e.g, United States v. Sharpe,* 470 U.S. 675, 682, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605 (1985); *United States v. Hensley,* 469 U.S. 221, 226, 105 S.Ct. 675, 678, 83 L.Ed.2d 604 (1985); *United States v. Shabazz,* 993 F.2d 431, 435 (5th Cir.1993); *United States v. Kelley,* 981 F.2d 1464 (5th Cir.1993). Under *Terry,* the judicial inquiry into the reasonableness of the search or seizure "is a dual one—whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Shabazz,* 993 F.2d at 435 (citing *Terry,* 392 U.S. at 19, 88 S.Ct. at 1879).

A stop of a vehicle when there is no probable cause to justify it can normally occur in one instance, and one instance only (outside of the border context): when there are artic-ulable facts which give rise to a "reasonable suspicion" that the suspect has engaged in, or is about to engage in, criminal activity. The following, quoted from *United States v. Tapia,* 912 F.2d 1367, 1370 (11th Cir.1990), is the standard definition of "reasonable suspicion:"

> According to *Terry,* even in the absence of probable cause, police may stop persons and detain them briefly in order to investigate a reasonable suspicion that such persons are involved in criminal activity. (citations omitted) In justifying such an intrusion, the "reasonableness" standard requires that a police officer "be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry,* 392 U.S. at 21, 88 S.Ct. at 1879 (footnote omitted). In this regard, "reasonable suspicion" is determined from the totality of the circumstances, *United States v. Sokolow,* 490 U.S. 1, 6–8, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989), and from the collective knowledge of the officers involved in the stop. *United States v. Williams,* 876 F.2d 1521, 1524 (11th Cir.1989); *United States v. Cotton,* 721 F.2d 350, 352 (11th Cir. 1983), *cert. denied,* 465 U.S. 1108, 104 S.Ct. 1614, 80 L.Ed.2d 143 (1984). Such a level of suspicion is obviously considerably less than proof of wrongdoing by a preponderance of the evidence, *INS v. Delgado,* 466 U.S. 210, 217, 104 S.Ct. 1758, 1763, 80 L.Ed.2d 247 (1984), or even the implicit requirement of probable cause that a fair probability that evidence of a crime will be found. *Sokolow,* 490 U.S. at 6–8, 109 S.Ct. at 1585. Nevertheless, "reasonable suspicion" must be more than an inchoate "hunch," and the Fourth Amendment accordingly requires that police articulate some minimal, objective justification for an investigatory stop. *Id.; Williams,* 876 F.2d at 1524.

In *Sokolow,* the Supreme Court reiterated which factors not in themselves proof of illicit conduct and/or quite consistent with innocent travel can, when taken together, give rise to a reasonable suspicion of criminal or drug activity. *Sokolow,* 490 U.S. at 10, 109 S.Ct. at 1587, 104 L.Ed.2d at 12. As early as 1983,

in the case of *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527, the Supreme Court noted that "innocent behavior will frequently provide the basis for a showing of probable cause," and that "[i]n making a determination of probable cause the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts." *Gates*, 462 U.S. at 243–44 n. 13, 103 S.Ct. at 2335 n. 13. In *Sokolow*, the Supreme Court applied this same principle to the reasonable suspicion inquiry. *Sokolow*, 490 U.S. at 10, 109 S.Ct. at 1587, 104 L.Ed.2d at 12.

### C. Fourth Amendment Analysis of Automobile Stops Along the Border is Intricate

In addition to the powers outlines *supra*, the Border Patrol is also given authority to conduct stops within 100 air miles of the United States—Mexico border. *See* 8 U.S.C. § 1357. Once cited in support of roving patrols, which indiscriminately pulled vehicles over on a "haunch," the statute's reach has been greatly curtailed by the Supreme Court. Although the wording of § 1357 has not changed much over the years, in order to fall within it, a Border Patrol Agent must now be able to articulate specific facts which made him suspicious that something illegal was afoot. It is then up to the courts to determine, under the totality of the circumstances, whether there was reasonable suspicion to effectuate a stop of the vehicle.

Section 1357, reads, in part, as follows:

(a) Powers without warrant

Any officer or employee of the Service authorized under regulations prescribed by the Attorney General shall have power without warrant—

(1) to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States;

. . . .

(3) within a reasonable distance from any external boundary of the United States, to board and search for aliens any vessel within the territorial waters of the United States and any railway car, aircraft, conveyance, or vehicle, and within a distance of twenty-five miles from any such boundary to have access to private lands, but not dwellings, for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States;

Federal regulations, 8 C.F.R. § 287.1(2), interpret the term "reasonable distance" to mean a distance "within 100 air miles from any external boundary of the United States . . . . ."

In *United States v. Brignoni–Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), the Supreme Court considered a question similar to the one currently before this court: may Border Patrol agents stop vehicles to check the citizenship status of the occupants? In *Brignoni–Ponce*, two Border Patrol agents were parked at an internal checkpoint, 5 miles south of San Clemente, California, observing oncoming traffic. The checkpoint had been closed due to inclement weather. It was nighttime, so the officers had their headlights directed at the oncoming vehicles. At some point they observed Brignoni–Ponce, a Mexican national who possessed a United States work permit, drive through. With him were two other individuals of Mexican descent. The agents decided to pull Brignoni–Ponce over to check his, and his passengers', citizenship status. As it turned out, both passengers were in the country illegally, and Brignoni–Ponce was charged with transporting illegal immigrants. At trial, he sought to suppress the testimony of and about the two passengers, claiming that this evidence was the fruit of an illegal seizure. *Id.* at 875, 95 S.Ct. at 2577, 45 L.Ed.2d at 613. The government contended that the above-quoted statutory provisions gave the agents the right to stop the defendant and question him and his passengers regarding their right to be in the United States. The government further claimed that at least in the areas adjacent to the Mexican border, a person's apparent Mexican ancestry alone justified belief that he or she was an alien and satisfied the requirements of 8 U.S.C. § 1357(a)(3).

The Supreme Court disagreed with both propositions. First, the Court reaffirmed its earlier decision in *Almeida–Sanchez v. United States,* 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973), which disapproved of roving patrols. Prior to that decision, Border Patrol agents could stop vehicles at will, at areas near the border other than at checkpoints, and search them for contraband or illegal aliens. The Court held that "in the absence of probable cause or consent, [such] searches violate ... [the] Fourth Amendment right to be free of 'unreasonable searches and seizures.'" *Id.* at 273, 93 S.Ct. at 2540, 37 L.Ed.2d at 603. In *Brignoni–Ponce,* the Court held that "to approve roving-patrol stops of all vehicles in the border area, without any suspicion that a particular vehicle is carrying illegal immigrants, would subject the residents of these and other areas to potentially unlimited interference with their use of the highways, solely at the discretion of Border Patrol officers." *Id.* at 882, 95 S.Ct. at 2581, 45 L.Ed.2d at 617. After *Almeida,* then, indiscriminate searches by roving patrols were no longer permitted. The second thing the Court did in *Brignoni–Ponce* was weigh the interest of the government to protect the country's borders from the influx of illegal immigrants versus the interest of individuals to be free from undue government intrusion. What the court came up with was the exact same standard used to justify an investigatory stop when probable cause is missing. After weighing the two competing interests, the Court noted that

... because of the importance of the governmental interest at stake, the minimal intrusion of a brief stop, and the absence of practical alternatives for policing the border, we hold that when an officer's observations lead him reasonably to suspect that a particular vehicle may contain aliens who are illegally in the country, he may stop the car briefly and investigate the circumstances that provoke suspicion. As in *Terry,* the stop and inquiry must be 'reasonably related in scope to the justification for their initiation.' (citation omitted). The officer may question the driver and passengers about their citizenship and immigration status, and he may ask them to explain suspicious circumstances, but any

further detention or search must be based on consent or probable cause.

*Id.* at 881–82, 95 S.Ct. at 2580–81, 45 L.Ed.2d at 617. A requirement of reasonable suspicion for stops allows the government adequate means of guarding the public interest and also protects residents of the border areas from indiscriminate official interference. *Id.* at 883, 95 S.Ct. at 2581, 45 L.Ed.2d at 617. The effect of the Court's decision was to limit exercise of the authority granted by both §§ 1357(a)(1) and (a)(3). Except at the border and its functional equivalents, officers on roving patrols may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country. *Id.* at 884, 95 S.Ct. at 2581–82, 45 L.Ed.2d at 618. The Court also shed some light on what may give rise to such reasonable suspicion.

Any number of factors may be taken into account in deciding whether there is reasonable suspicion to stop a car in the border area. Officers may consider the characteristics of the area in which they encounter a vehicle. Its proximity to the border, the usual patterns of traffic on the particular road, and previous experience with alien traffic are all relevant. (citations omitted) They also may consider information about recent illegal border crossings in the area. The driver's behavior may be relevant, as erratic driving or obvious attempts to evade officers can support a reasonable suspicion. (citations omitted) Aspects of the vehicle itself may justify suspicion.... The vehicle may appear to be heavily loaded, it may have an extraordinary number of passengers, or the officers may observe persons trying to hide.... In all situations, the officer is entitled to assess the facts in light of his experience in detecting illegal entry and smuggling. (citing *Terry*).

*Id.* at 884, 95 S.Ct. at 2581–82, 45 L.Ed.2d at 618–19. Addressing the point of whether the fact that the driver and the occupants of the vehicle appeared to be of Mexican ancestry was by itself enough to justify the stop, the Supreme Court held that

this factor alone would justify neither a reasonable belief that they were aliens, nor a reasonable belief that the car concealed other aliens who were illegally in the country ... The likelihood that any given person of Mexican ancestry is an alien is high enough to make Mexican appearance a relevant factor, but standing alone it does not justify stopping all Mexican–Americans to ask if they are aliens.

*Id.* at 886–87, 95 S.Ct. at 2582–83, 45 L.Ed.2d at 619–20.

### 3. ANALYSIS OF FACTS IN LIGHT OF LAW

In the case at hand, Agent Garcia considered the following factors in deciding that a stop was warranted to check the van's occupants' citizenship status: time of day (Agent Garcia testified that there was usually very little traffic in the Presidio area at that time of the morning), proximity to the border (at the time of the near collision, the cars were less than one mile from the river), the type of vehicle Defendant was driving (although Agent Garcia conceded that any type of vehicle can be used to transport illegal aliens), Defendant's outward appearance (Defendant is of Mexican descent), failure to yield resulting in a near collision on O'Reiley street (indicating to the Agent that Defendant was probably from out of town), Defendant's stopping at a closed gas station (confirming the Agent's suspicion that the Defendant was from out of town), the attempt to evade the Agent (evidenced by the sudden departure from the gas station as soon as the Agent's marked Border Patrol vehicle came into view), and the inexplicable driving on the shoulder of the road. Analyzed separately, each of the listed factors would not arouse suspicion that something illegal was afoot. Locals fail to follow yield signs, causing accidents. Tourists or passers-through come in from out of town, miss an exit, and try to regroup. Individuals under a mistaken belief that a Border Patrol vehicle has the right of way at all times may move over onto the shoulder of the road to let it pass. None of the activities listed are independently illegal or suspicious. However, what may seem like innocuous conduct to an untrained eye, may seem very suspicious to a trained Border Patrol agent. As the Supreme Court held in *Gates,* "the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of non-criminal acts." In addition, what gives rise to reasonable suspicion is much less than proof requiring wrong doing by a preponderance of the evidence. The agent must have something more than a haunch, but need not wait until he has enough to tip the scales of justice under a preponderance standard.

### A. Reasonable Suspicion Justified the Stop

Being fully cognizant of the Supreme Court's disapproval of roving-patrols in *Almeida–Sanchez,* the court finds that Agent Garcia satisfactorily showed the court that he was under a reasonable suspicion that the Defendant was an illegal alien or was transporting illegal aliens. Because the analysis under *Almeida–Sanchez* and *Brignoni–Ponce* is so fact specific, were any of the factors articulated by Agent Garcia different, the outcome of the suppression hearing may have been different as well. If only one factor of those listed above was present, Agent Garcia could not have lawfully made the stop. Nor could Agent Garcia or his border patrol colleagues have made a stop solely on the basis of their perception that the vehicle was speeding, that it bore Mexican license plates, or that the driver appeared to be of Mexican descent. While each of these factors may be considered together with others, they do not have overwhelming weight under the totality of the circumstances analysis. A vehicle bearing Mexican license plates and being driven by an individual of Mexican descent, which "appears" to be speeding, without more, is not reason enough to pull someone over to check their citizenship status. While the factors listed in *Almeida–Sanchez* are illustrative, several other *Almeida–Sanchez* type factors need to be present in order for the stop to pass muster in the absence of probable cause: the time of day, the road being traveled, the vehicle being driven, the driver's demeanor, etc.. Everything, of course, needs to be taken into account in light of the

agent's experience and training. Here, Agent Garcia testified that all of the factors he listed, in his experience, gave rise to a suspicion that something illegal was afoot. The court is satisfied that the government has met its burden of justifying the initial stop under the Fourth Amendment.

■■■ Once a stop is made, an agent could question the driver and the passenger about their citizenship and immigration status, and may ask them to explain suspicious circumstances. *See Brignoni–Ponce,* 422 U.S. at 881–82, 95 S.Ct. at 2580–81, 45 L.Ed.2d at 617. Any further detention or search must be based on consent or probable cause. *Id.* Agent Garcia approached the driver's side window and asked the Defendant and her companion to produce documents evidencing their citizenship status. While the Defendant was able to produce a naturalization certificate, her companion was unable to produce any documents whatsoever. Not only did the companion's lack of documents raise suspicion in the Agent's mind, but the Defendant vouched that the companion was her 15–year old niece, when she looked much older to the Agent. However, before the Agent could question the passenger further, he noticed the relatively fresh mud on the car and, after further inquiry, learned that the van had made an illegal crossing sometime earlier that day. Although the Agent had not noticed the mud until after he had stopped the vehicle, his inquiry into its origin was clearly permissible. Once a legal stop is made, an agent need not wear blinders and be oblivious to everything going on around him. In fact, an agent can, and should be, very vigilant in trying to ferret out illegal activity within the confines of the law. Thus, an agent who smells marijuana as soon as the window is rolled down or sees contraband in plain view inside the car need not ignore these violations simply because the initial purpose of the stop was to check the occupants' citizenship status. Oftentimes, when a stop is based on something less than probable cause, probable cause to search the vehicle arises after the fact.

### B. Probable Cause Arose After the Stop

It is well established that warrantless searches of automobiles are permitted by the Fourth Amendment if supported by probable cause. *United States v. Seals,* 987 F.2d 1102, 1107 (5th Cir.1993) (citing United States v. Ross, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982)). " 'Probable cause determinations are not to be made on the basis of factors considered in isolation, but rather on the totality of the circumstances." ' *United States v. Reed,* 882 F.2d 147, 149 (5th Cir.1989). "The factors relevant to probable cause are not technical ones, but rather factual and practical ones of everyday life on which reasonable and prudent persons, not legal technicians, act." *Id.* (quoting *United States v. Tarango–Hinojos,* 791 F.2d 1174, 1176 (5th Cir.1986)); *United States v. Kelly,* 961 F.2d 524 (5th Cir.1992). This so called automobile exception provides that if, under the totality of the circumstances, officers have probable cause to believe that a vehicle contains contraband, they may search the vehicle without a warrant. *See United States v. Buchner,* 7 F.3d 1149, 1154–55 (5th Cir.1993); *United States v. Seals,* 987 F.2d 1102, 1107 (5th Cir.1993). The Supreme Court has held that the automobile exception to the warrant requirement applies when a vehicle is "readily capable" of "being used on the highways" and it "is found stationary in a place not regularly used for residential purposes...." *California v. Carney,* 471 U.S. 386, 392, 105 S.Ct. 2066, 2070, 85 L.Ed.2d 406 (1985). The Fifth Circuit has concluded that, under *Carney,* "probable cause alone suffices to justify a warrantless search of a vehicle lawfully parked in a public place, as long as the scope of the search is reasonable." *United States v. Sinisterra,* 77 F.3d 101, 104 (5th Cir.1996); *United States v. Cooper,* 949 F.2d 737, 747 (5th Cir.1991) (quotation omitted). The Fifth Circuit has also applied the automobile exception to admit evidence seized in warrantless searches of vehicles which were legally parked in privately-owned motel parking lots where there was probable cause to search but no showing of exigent circumstances. *United States v. Sinisterra,* 77 F.3d 101, 105 (5th Cir.1996); *United States v. Buchner,* 7 F.3d 1149, 1150–51, 1154–55 (5th Cir.1993) (LaQuinta Motel); *United States v. Ervin,* 907 F.2d 1534, 1536–39 (5th Cir.1990) (Big Bend Motor Inn Motel).

In the case *sub judice,* while the stop and the questioning took place in a motel parking lot, the search of the vehicle did not take place until after the van had been driven back to the Border Patrol station. The fact that a drug sniffing dog did not alert to the presence of drugs did not deprive Border Patrol agents of probable cause to search the vehicles back at the station. While an alert by a dog can provide the needed probable cause to conduct a search of a vehicle, a dog "sniff" itself is not considered a search. *United States v. Seals,* 987 F.2d 1102, 1106 (5th Cir.1993); *United States v. Hernandez,* 976 F.2d 929 (5th Cir. 1992); *United States v. Gonzalez–Basulto,* 898 F.2d 1011, 1013 (5th Cir.1990); *United States v. Place,* 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983). Agent Garcia had every right to require the van to accompany him back to the Station for an inspection. Aside from the fact that all vehicles entering through unmanned posts must report at staffed checkpoints, the Agent had probable cause to believe that contraband was on board from all of the previously enumerated factors, and from the fact that the van had made an illegal border crossing earlier in the day and the Defendant had admitted to receiving $3,000 to drive the vehicle to Marfa, some 40 miles away. Because drug smugglers have become more sophisticated in masking the scent of narcotics they are transporting, and because the reliability of drug sniffing dogs is not 100 percent, the fact that a dog did not alert at the scene did not deprive Agent Garcia from searching the van on the basis of probable cause.[1] For the foregoing reasons, the court finds that the initial stop was lawful and that the subsequent search of the vehicle was based on probable cause. Accordingly,

It is ORDERED that Defendant's Motion to Suppress Evidence be DENIED.

---

1. It is well settled law that a dog sniff is not a search and does not implicate the Fourth Amendment. *United States v. Mendez,* 27 F.3d 126, 129 n. 4 (citing *United States v. Lovell,* 849 F.2d 910, 913 (5th Cir.1988)). While a dog alert is sufficient to create probable cause to conduct a warrantless vehicle search, *United States v. Dova-li–Avila,* 895 F.2d 206, 207 (5th Cir.1990), a non-alert does not deprive the agents of probable cause to search the vehicle without a warrant if the probable cause arose on other grounds. *See United States v. Thomas,* 787 F.Supp. 663, 684 (E.D.Tex.1992). In *Thomas,* the court wrote that "no probable cause was necessary for the dog to sniff the outside of the car because the dog merely amplified the human olfactory capacity, which under the circumstances would not have been a search under the Fourth Amendment." *Id.* at 684 (citing *United States v. Lovell,* 849 F.2d 910, 914 (5th Cir.1988)). Thus, if factors other than the smell of a narcotic give rise to probable cause, a warrantless search of a vehicle may be conducted. Such was the situation in the case at hand. Although the dog did not detect any narcotics in the van, Agent Garcia had observed numerous factors, such as the fresh mud on the van and Defendant's admission that the van had made an illegal border crossing earlier in the day, which gave him the probable cause to conduct a search. The fact that the search did not take place on the spot, but took place back at the border patrol checkpoint did not deprive the Agent of the probable cause to conduct the search.