IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 96-41240
_____


UNITED STATES OF AMERICA,

                                    Plaintiff - Appellee,

v.

SCYRUS DION HEBERT,

                                    Defendant - Appellant.


_____

Appeal from the United States District Court
for the Eastern District of Texas
_____
December 15, 1997

Before DeMOSS and DENNIS, Circuit Judges, and ROSENTHAL[*],

District Judge.

PER CURIAM:

        Defendant-appellant Scyrus Dion Hebert was convicted in

the Eastern District of Texas on four counts of bank robbery,

eleven counts of use of a firearm during the course of a violent

crime, and seven counts of interference with commerce by committing

robbery, in violation of the Hobbs Act.[2]

_____

[*] District Judge of the Southern District of Texas, sitting by designation.

[2]    The Hobbs Act reads in pertinent part:

       Whoever in any way or degree obstructs, delays, or
       affects commerce or the movement of any article or
       commodity in commerce, by robbery or extortion or
       attempts or conspires so to do, or commits or threatens
       physical violence to any person or property in

Hebert appeals his convictions on the following grounds: (1) the Hobbs Act is unconstitutional under United States v. Lopez, 115 S. Ct. 1624 (1995); (2) the district court improperly instructed the jury as to the Hobbs Act; (3) there was insufficient evidence that Hebert knowingly affected interstate commerce or that Hebert's robberies had a substantial effect on interstate commerce, necessary to support a conviction under the Hobbs Act, and insufficient evidence that Hebert committed the robberies alleged in the indictment, or used a firearm in connection with any of the robberies; (4) Hebert's arrest was without probable cause, in violation of the Fourth Amendment; and (5) the district court erred by imposing consecutive sentences for each firearm count.

We affirm the district court on all of Hebert's points of appeal, for the reasons stated below.

## I.    Factual Background

### A.    The Bank of America Robbery

On March 21, 1996, a branch of the Bank of America in Port Arthur, Texas, was robbed at approximately 1:55 p.m. At trial, witnesses described the robber as a black male, with a short beard, wearing dark clothing and gloves. The robber had what appeared to be a black nylon stocking and a red bandanna over his head. The robber was armed with a chrome-plated handgun. The witnesses testified that the robber burst into the bank, jumped on

---

furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

18 U.S.C. § 1951(a).

2

and over a teller counter, and took cash from several teller drawers. The robber then ran out the front door.

Another witness, Jim Shoffner, testified at trial that during the afternoon of March 21, 1996, he was in his delivery truck parked a block from the bank. At about 2:00 p.m., Shoffner saw a man running toward him from the direction of the bank. Shoffner noticed that the man was carrying something that appeared to be spraying red paint. Shoffner testified that he remembered that banks often use dye-emitting devices to mark stolen items. Shoffner heard a car travelling in his direction at a high rate of speed. Shoffner noted the rear license plate number of the car, which he later told police was FRK 93M. Shoffner also noticed that the car was blue, had a vinyl top, had no front license plate, and that the trunk was held shut with what appeared to be a black cord. Shoffner thought that the car was probably a Buick, perhaps a Buick Regal.

Shoffner testified that he noticed cash lying in the street near where the blue car had been parked. He got out of his truck to pick up the cash and noticed something that looked like a "battery pack" that might emit dye. Shoffner left the "battery pack" in the street and brought the cash to the bank. At the bank, Shoffner telephoned the Port Arthur police. Gene Christian, a Port Arthur police officer, went to the place where Shoffner picked up the money and found an exploded dye-pack and a piece of a twenty-dollar bill.

3

Patsy Byers testified at trial that she heard reports of the robbery and a description of the "getaway" car on her police scanner radio. As Byers drove by Alford's Supermarket, located about seven or eight miles from the bank, she noticed a car parked at a nearby gas station that matched the description of the car given on the radio. Byers stopped at Alford's and called the police. Byers testified that she saw a man, whom she identified at trial as Hebert, leave the gas station, get into the car, and drive to Alford's Supermarket. Byers again called the police, using a telephone at the gas station. From the gas station, Byers watched Hebert open his trunk, "dig[] around in" it, and enter the market.

Police officer Al Gillen testified that after he heard a radio report that the "getaway" car had been sighted at Alford's, he drove to the supermarket. Gillen saw a car matching the description of the getaway car parked in the parking lot. No one was in the car. Gillen looked into the car through an open window and saw a "reddish tint" on the inside of the driver's-side door.

Officer Mark Holmes also drove to Alford's after hearing the dispatcher's report of the robbery and the witnesses' description of the robber and the car.[3] Holmes testified that at Alford's, he saw a car matching the description of the car broadcast over the radio. Holmes looked through the car window and

_____

[3] The dispatcher stated that the robbery suspect was driving an early 1980s dark blue two-door Buick, with a rope hanging out of the trunk, and no front license plate. The dispatcher read the back license number, FRK 93M. The dispatcher described the robber as a black male, wearing a black cloth shirt, dark blue cloth pants, black and white athletic shoes, gloves, and carrying a small chrome pistol. The dispatcher also reported that a red dye-pack concealed in the stolen money had exploded on the robber shortly after he fled the bank.

4

noticed a red paint-like material on the inside of the driver's-side door. Holmes saw a man, later identified as Hebert, leave the store and head for the car. Holmes stopped Hebert and asked his name. The suspect stated that his name was "Scyrus." Holmes asked Hebert if one of the vehicles in the parking lot was his. Hebert hesitated, then indicated the Buick. Holmes asked Hebert where he was coming from. Hebert volunteered that he lived in Beaumont, had become lost, and had had a flat tire on a nearby road. During the conversation, Holmes noticed that Hebert had a red substance on his pants and hands and was wearing black and white athletic shoes. As Hebert was talking to Holmes, officer Gillen, standing nearby, also noticed a red color on Hebert's pants leg. These details matched the dispatcher's description of the robbery suspect. Holmes detained and handcuffed Hebert.

The police officers took Jim Shoffner to the Alford's parking lot, where Shoffner identified the Buick as the vehicle he had seen driving toward him earlier that day. The police officers towed the Buick to the station, obtained a search warrant, and searched the car. Holmes testified that in the search, he saw and/or recovered a nylon woman's stocking; a sweatshirt and socks with a red dye-like substance on them; and an inflated tire.

At trial, the government presented evidence that the red substance found on Hebert, his clothes, and his car was the dye emitted during the Bank of America robbery.[4]

---

[4] An employee of the company that manufactured the dye-packs taken in the robbery testified that the red substance on the recovered money, the clothing from Hebert's car, and Hebert's car itself appeared to be the dye emitted from

5

## B.	The Other Robberies

A series of bank, restaurant, and liquor store robberies had taken place in the Beaumont, Texas area between November 1995 and March 1996.  The businesses robbed were a Texas Commerce Bank branch, a Hardee's restaurant, a Piccadilly Cafeteria, A.J.'s Discount Liquor Store, a Lucky Liquor, Inc. Store, Debb's Liquor Store, a Mr. Gatti's restaurant, and two robberies each of the Southeast Affiliated Federal Employees Credit Union and a Popeye's Chicken restaurant.  Witnesses to most of these robberies described the robber as wearing a red bandanna.  The Port Arthur Bank of America robber also wore a red bandanna.

At trial, the manager of the Hardee's restaurant robbed on November 9, 1995 testified that the robber was a black male carrying a chrome-plated gun, wearing a red bandanna.  The manager positively identified Hebert as the robber at trial.

An employee of the Popeye's restaurant robbed on November 8 and 12, 1995, described the robber as a black male carrying a chrome semi-automatic handgun, wearing a red bandanna.  The assistant manager testified that she saw the robber during the

---

the Bank of America dye-packs.  The employee testified that the dye, known as "1MAAQ," is unique to his company and is registered with the FBI.  The employee also testified that the only way a person can be marked by the dye is by handling a dye-pack.  The director of the Jefferson County Sheriff's Department Regional Crime Lab testified that he and his staff gathered evidence from Hebert's car, including car parts and clothing stained with red dye, and took swabbings from red stains on Hebert's hands.  An examiner in the chemistry toxicology unit at the FBI lab testified that he was familiar with 1MAAQ.  The examiner testified that the gloves used by the Regional Crime Lab technicians to swab Hebert's hands tested positive for 1MAAQ, as did the swabbings of Hebert's hands, the dye-pack remnant and money recovered from Fifteenth Street, clothing from Hebert's car, parts of the car's driver's-side door, money found in the car, and Hebert's left tennis shoe.

second robbery.  She also described the robber as a black male, wearing a red bandanna, carrying a silver gun.

An employee with the Piccadilly's Cafeteria that was robbed on November 9, 1995 testified that the robber was a black male wearing a red bandanna.  The employee testified that the robber held a chrome-plated semi-automatic pistol, turned to the side.

The Southeast Affiliated Federal Employees Credit Union was robbed twice, on November 14, 1995, and January 2, 1996. A teller testified that the first robbery was committed by a black male carrying a small silver-chromed gun, and that the second robbery was committed by the same person carrying a similar gun and wearing a red bandanna and black and white tennis shoes.  The teller also observed from a videotape and photographs of the robbery that the robber held the gun turned to the side.  Another witness present at the first credit union robbery testified that the robber was a black male, carrying a small, silver, shiny pistol, and wearing a nylon stocking over his head and a red scarf or bandanna.  The president of the credit union testified that Hebert had been a customer of the credit union from March 9, 1992 to July 16, 1993.

A teller at the Texas Commerce Bank that was robbed on November 29, 1995 testified that the robber was a black male carrying a chrome semi-automatic pistol. Another teller testified that the robber was a black male, carrying a silver gun, and wearing a red bandanna.  The manager of a business located next to

the Texas Commerce Bank saw a black male wearing black and white shoes, holding a chrome-plated handgun turned sideways, running away after the robbery.

An identification technician specialist with the Port Arthur Police Department also testified that a shoe print from the Bank of America teller counter that the robber jumped on was similar to the print of the bottom of the shoes Hebert was wearing when he was arrested. An examiner from the FBI lab compared footprints taken from the Bank of America teller counter and the teller counter of the Texas Commerce Bank that was robbed, with Hebert's shoes. The examiner concluded that the shoes corresponded in design and physical size to the latent prints.

The manager of A.J.'s Liquor Store, robbed on February 16, 1996, testified that the robber was a male carrying a chrome-plated, automatic gun, wearing a bandanna. Earlier that day, Hebert's payroll check was cashed at A.J.'s. Hebert's other payroll checks were cashed at other locations.

The owner of Debb's Liquor Store, which was robbed on March 5, 1996, testified that the robber was a black male, carrying a silver semi-automatic pistol, wearing a stocking and a red bandanna.

An employee of the Mr. Gatti's restaurant robbed on March 20, 1996 testified that the robber was a black male carrying a silver pistol, wearing a black nylon stocking over his face and black and white athletic shoes. The employee identified the shoes as the same shoes that Hebert wore when he was arrested. The

8

assistant manager of Mr. Gatti's identified clothing found in Hebert's car, and Hebert's shoes, as similar to the clothing and shoes that the robber wore during the Mr. Gatti's robbery. She also testified that he used a silver handgun.

The superintendant at the Industrial Metal Company in Beaumont testified that Hebert worked for Industrial Metal as a structural steel fitter until he was laid off on March 20, 1996, the day of the Mr. Gatti's robbery and the day before the Texas Commerce Bank robbery. The superintendant testified that Hebert often wore a red bandanna at work.

An individual named Kevin Stewart testified that he bought a chrome .38 caliber semi-automatic pistol for Hebert's wife in August 1995. Stewart last saw the gun in the possession of Hebert's wife in September 1995.

An FBI agent who reviewed the bank accounts of Hebert's wife (Hebert did not have any bank accounts) testified that deposits were made to those accounts that were inconsistent with the income of Hebert and his wife. Several "suspicious" deposits were made near the time of some of the robberies. One day before the A.J.'s Liquor Store robbery, Hebert's wife had $2,374.21 in her checking and savings accounts; four days later, Hebert and his wife bought a used car with $6,000 cash. The agent was unable to locate any source of income for Hebert or his wife that would explain this and other large cash purchases.

The agent also testified that the Popeye's restaurant and A.J.'s Liquor Store that were robbed are located only one or two

9

blocks from Hebert's residence; Debb's Liquor Store is located near Hebert's parents' residence. Hebert's superintendent testified that the Texas Commerce Bank that was robbed is located two to three minutes away from Hebert's jobsite.

**C.    The Evidence of the Effect of the "Hobbs Act" Robberies on Interstate Commerce**

The government presented evidence that each of the stores and restaurants robbed had lost money that would have been used to buy supplies and goods from out of state. The Hardee's manager testified that the restaurant bought many of its supplies from Ardmore, Oklahoma, and that the $117 taken in the robbery would have been used to buy supplies and pay employees. The Popeye's manager testified that the restaurant bought its chicken from Arkansas and other supplies from Louisiana. She testified that the $500 taken in the two Popeye's robberies would have been used to purchase chicken and supplies from out of state. The cashier of the Picadilly Cafeteria testified that fifty to sixty percent of the cafeteria's food items came from out of state. The cashier testified that $600 was taken in the robbery. The Picadilly chain, consisting of 130 restaurants located in the south and southeast United States, is headquartered in Louisiana. The manager of A.J.'s Liquor Store testified that seventy to eighty percent of the liquor it sells comes from out of state; its customers include people travelling out of Texas. He testified that some of the $12,000 taken in the A.J.'s robbery would have been used to buy food and inventory from out of state.

10

None of these witnesses testified that the robberies caused them to forego, reduce, or delay specific purchases from out of state.

## II.  Procedural Background

On April 18, 1996, a grand jury in the Eastern District of Texas returned a two-count indictment against Hebert for bank robbery,[5] and use of a firearm during the course of a violent crime,[6] based on the Bank of America robbery.

On May 16, 1996, the grand jury returned a superseding twenty-four count indictment, adding three counts of bank robbery, eleven counts of use of a firearm during the course of a violent crime, and eight counts of interference with commerce by committing robbery in violation of the Hobbs Act.

The jury convicted Hebert of twenty-two of the twenty-four counts in the superseding indictment.  The jury found Hebert not guilty of the count alleging use of a firearm and the Hobbs Act count relating to the robbery of the Lucky Liquor Store.  Hebert received a sentence of 60 months for the use of a firearm count relating to the first Popeye's robbery, 121 months each for the bank robbery and Hobbs Act counts, to run concurrently, and 240 months for each of the subsequent ten convictions for use of a firearm, each to run consecutively.  Hebert was sentenced to a total of 2581 months of imprisonment, or approximately 215 years. Hebert was also ordered to pay $36,475 in restitution.

---

[5]     18 U.S.C. § 2113.

[6]     18 U.S.C. § 924(c).

11

This timely appeal followed.

## III. Discussion

### A.    The Challenge to the Hobbs Act

Hebert argues that the district court erred in denying his motion to dismiss the indictment based on the facial unconstitutionality of the Hobbs Act.  Hebert moved to dismiss the indictment on the ground that United States v. Lopez requires a "substantial effect" on interstate commerce for federal regulation. 115 S. Ct. at 1629-30.  Hebert argues that the Hobbs Act conflicts with Lopez in permitting conviction for acts that, by themselves, have no more than a minimal effect on interstate commerce.

During this appeal, this court rejected the same argument.  In United States v. Robinson, 119 F.3d 1205 (5th Cir. 1997), this court held:

> [U]nder the third category of the commerce power described in Lopez, the particular conduct at issue in any given case need not have a substantial effect upon interstate commerce. . . . so long as the regulated activity, in the aggregate, could reasonably be thought to substantially affect interstate commerce. . . .  [T]he cumulative result of many Hobbs Act violations is a substantial effect upon interstate commerce.

Id. at 1215.  Since Robinson, this court reached the same result in United States v. Miles, 122 F.3d 235, 241 (5th Cir. 1997).  These precedents preclude Hebert's challenge.

### B.    The Challenge to the Jury Instructions

Hebert argues that the district erred in: (1) refusing his instruction that a violation of the Hobbs Act occurs if a robbery had a "substantial," rather than "minimal," effect on

12

interstate commerce; (2) instructing the jury that a "potential" effect on interstate commerce was a sufficient basis for a Hobbs Act violation; (3) removing an element of a Hobbs Act violation from the jury's consideration, contrary to United States v. Gaudin, 115 S. Ct. 2310 (1995); and (4) failing to instruct the jury that Hebert must have "knowingly" committed a robbery.

A district court's refusal to submit a proposed jury instruction is reviewed for abuse of discretion. United States v. Greig, 967 F.2d 1018, 1027 (5th Cir. 1992). "A trial court's refusal to give a requested instruction constitutes reversible error when (1) the requested instruction is substantially correct, (2) the actual charge given to the jury did not substantially cover the content of the proposed instruction, and (3) the omission of the instruction would seriously impair a defendant's ability to present a given defense." United States v. Daniel, 957 F.2d 162, 170 (5th Cir. 1992). We review an included jury instruction objected to as inaccurate for abuse of discretion and will reverse only if the instruction fails correctly to state the law. United States v. Gray, 96 F.3d 769, 775 (5th Cir. 1996), cert. denied, 117 S. Ct. 1275 (1997).

Hebert's first argument is foreclosed by this court's decision in Robinson. Hebert's second argument is foreclosed by the charge itself.

The district court instructed the jury in relevant part as follows:

> For you to find the defendant guilty of [a Hobbs Act violation] . . . you must be

13

convinced that the government has proved each of the following beyond a reasonable doubt:

. . . .

That the robberies obstructed, delayed or affected commerce. The effect on commerce need only be minimal. Both direct and indirect effects on interstate commerce may violate Section 1951. The government must prove that the defendant knew that his conduct would obstruct, delay, or affect commerce. In this case, the government argues that the entities cited in [the Hobbs Act counts] actively engaged in interstate commerce, and their assets were depleted by defendant's acts of robbery, thereby curtailing their potential as purchasers of goods in the stream of interstate commerce. If you find that the government had proved this beyond a reasonable doubt, then the necessary effect on interstate commerce has been shown.

The district court did not instruct the jury that a "potential" effect on interstate commerce was sufficient to find a Hobbs Act violation. The district court's instruction stated that Hebert's alleged robberies must have curtailed the victims' "potential as purchasers of goods in the stream of interstate commerce." (emphasis added). This instruction is consistent with this court's holdings in Miles and Robinson, defining a de minimis effect on interstate commerce as a depletion of the assets of a business that purchases out-of-state goods and supplies. Miles, 122 F.3d at 236-37, 241; Robinson, 119 F.3d at 1212.

Hebert's third argument is that the charge violated the holding of United States v. Gaudin, that "the Constitution gives a criminal defendant the right to demand that a jury find him guilty of all the elements of the crime with which he is charged." 115 S. Ct. at 2314. Hebert's Gaudin argument is that, by equating a

14

reduction in a store's ability to purchase out-of-state goods with an effect on commerce, the district court improperly reserved for itself the question of whether the alleged robberies affected interstate commerce. This argument is foreclosed by this court's en banc decision in United States v. Parker, 104 F.3d 72 (5th Cir.) (en banc), cert. denied, 117 S. Ct. 1720 (1997), approving a substantially similar charge in a Hobbs Act case, against a similar challenge. Id. at 73; see also Miles, 122 F.3d at 239-40 (citing Parker in upholding a similar charge against a Gaudin challenge).[7]

Hebert's fourth argument, that the district court failed to instruct the jury that Hebert must have "knowingly" committed a

---

[7] The jury instruction approved in Parker stated, in pertinent part:

> If you believe beyond a reasonable doubt the government's evidence regarding the handling of cash proceeds from the Payless Shoe Store referred to in Count 1 of the indictment, that is, that monies obtained from the operations of such store were routinely wired or electronically transferred from the State of Texas for deposit in a bank in another state, then you are instructed that the interstate commerce element . . . has been satisfied.

United States v. Parker, 73 F.3d 48, 50 (5th Cir. 1996), aff'd in part and rev'd in part, 104 F.3d 72 (5th Cir.) (en banc), cert. denied, 117 S. Ct. 1720 (1997).

The instruction approved in Miles read:

> If you believe beyond a reasonable doubt the government's evidence regarding interstate commerce, to wit, that McDonald's, Colters, and Taco Bueno bought and sold merchandise that had traveled from another state to Texas, or that the robberies affected sales by the stores of such merchandise, or that the money proceeds from these stores moved in interstate commerce, or that these stores served customers who travel in interstate commerce, then you are instructed as a matter of law that there was an effect on interstate commerce.

Miles, 122 F.3d at 239.

In the Parker and Miles instructions, as here, the district courts equated the loss of money that is routinely transferred out of state with an effect on interstate commerce.

15

robbery, is foreclosed by the charge itself. In the charge, the court instructed the jury that the third element of a Hobbs Act violation is that "[t]he defendant knew the entities described in [the Hobbs Act counts] parted with the property because of robbery."[8] Hebert did not object to this portion of the jury charge at trial; we therefore review the instruction for plain error. United States v. Willis, 38 F.3d 170, 179 (5th Cir. 1994).

Under the plain error standard, this court "may only reverse appellant['s] convictions if (1) there was an error, (2) the error was clear and obvious, and (3) the error affected a defendant's substantial rights." United States v. Jobe, 101 F.3d 1046, 1062 (5th Cir. 1996). The instruction states that the defendant must have known that he was committing a robbery; no "clear and obvious" error occurred.

C.   **The Challenge to the Sufficiency of the Evidence to Sustain the Hobbs Act Convictions**

"[A]n attack on the sufficiency of the evidence to sustain a criminal conviction is judged from the standpoint of whether, after viewing all evidence presented and all inferences that may reasonably be drawn from the evidence in the light most favorable to the prosecution, any reasonable jury could have found that the defendant was guilty beyond a reasonable doubt." United

---

[8]   The charge defined "robbery" as

> the unlawful taking or obtaining of personal property from the person or in the presence of another, against his or her will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his or her person or property, or property in his or her custody or possession.

16

States v. Harris, 104 F.3d 1465, 1470 (5th Cir.) (citations omitted), cert. denied, 118 S. Ct. 103 (1997); see also Jackson v. Virginia, 99 S. Ct. 2781, 2789 (1979).

Hebert's first insufficiency argument is based on the district court's instruction as to one of the elements of a Hobbs Act violation. The district court instructed the jury that to prove a Hobbs Act violation, "[t]he government must prove that the defendant knew that his conduct would obstruct, delay, or affect commerce." Hebert asserts that no evidence presented at trial showed that he "knew" his alleged acts would affect interstate commerce.

It is well settled that the word "knowingly," as used in 18 U.S.C. § 1951(a), does not modify the term "affect interstate commerce." See, e.g., United States v. Castleberry, 116 F.3d 1384, 1389 (11th Cir.), cert. denied, 1997 WL 611777 (U.S. Oct. 20, 1997); United States v. Arambasich, 597 F.2d 609, 611 (7th Cir. 1979); United States v. Spagnolo, 546 F.2d 1117, 1119 n.5 (4th Cir. 1976); United States v. Nakaladski, 481 F.2d 289, 299 (5th Cir. 1973). By including such an instruction, the charge in this case effectively imposed a higher burden of proof on the government than is necessary under the statute. A jury instruction that unduly favors the defendant cannot be basis of an insufficiency claim. See Gladden v. Roach, 864 F.2d 1196, 1200 (5th Cir. 1989); United States v. Thomas, 567 F.2d 638, 641 (5th Cir. 1978); United States v. Rosa, 17 F.3d 1531, 1546 (2d Cir. 1994); cf. Harris, 104 F.3d at 1473 n.9 (finding no error in a district court's instruction on the

17

affirmative defense of duress when the instruction omitted one of the elements of the defense, and therefore "if anything, the instruction favored the [defendant]").

Hebert's second insufficiency argument is that the government presented insufficient evidence to prove beyond a reasonable doubt that Hebert's robberies of the restaurants and liquor stores had a substantial effect on interstate commerce. Hebert relies on the argument that the Hobbs Act must be interpreted to require a substantial, rather than de minimis, effect on commerce. This argument is foreclosed by Robinson and subsequent cases.

In his brief, Hebert did not explicitly argue that the evidence at trial was insufficient to prove even a de minimis effect on interstate commerce. Recent Fifth Circuit cases have made it clear that evidence similar in both quality and quantity to that introduced against Hebert is sufficient to support Hobbs Act convictions. In Robinson, the government showed the required effect on commerce under the Hobbs Act by presenting evidence that the stores lost thousands of dollars in the robberies and that those robberies impaired the stores' ability to cash out-of-state checks and to re-stock goods from other states. Robinson, 119 F.3d at 1215. The Fifth Circuit affirmed this evidence as sufficient under the "aggregation principal": the disruptions to interstate commerce caused by the robberies, "if repeated at retail stores across the nation, would amount to a substantial effect upon interstate commerce." Id.

18

In Miles, the court upheld Hobbs Act convictions on evidence strikingly similar to that presented here. The evidence in Miles was that the restaurants and stores lost money in the robberies; the businesses routinely purchased supplies and goods from out of state; and the money taken in the robbery would have been used, at least in part, for such purchases. See Miles, 122 F.3d at 236-37, 241. The evidence did not show that the robberies caused the businesses to forego, reduce, or delay their purchases from out of state.[9]

The evidence as to the effect of Hebert's robberies of the restaurants and liquor stores is very similar. The government elicited testimony from managers or owners of each of the robbed establishments that each robbery depleted cash assets of the store or restaurant, and it was the regular course of business of that store or restaurant to buy products from out of state. Under binding Fifth Circuit precedent, such evidence is sufficient for the jury to conclude that each of the restaurant and liquor store

---

[9]     Under the "depletion of assets" theory, see, e.g., Robinson, 119 F.3d at 1212; United States v. Collins, 40 F.3d 95, 99 (5th Cir. 1994), cert. denied, 115 S. Ct. 1986 (1995), the government need not "'show that any particular shipment of merchandise'" was obstructed or delayed by the robbery, United States v. Zeigler, 19 F.3d 486, 493 (10th Cir. 1994) (quoting Esperti v. United States, 406 F.2d 148, 150 (5th Cir. 1969)), or that the business "actually purchased fewer goods because of the [robbery]." Id. Rather, a showing that the business regularly buys goods from out of state allows an inference that the robbery will impair a future purchase. See id. at 490-92; United States v. Blakey, 607 F.2d 779, 784 (7th Cir. 1979) ("'[C]ommerce is affected when an enterprise, which either is actively engaged in interstate commerce or customarily purchases items in interstate commerce, has its assets depleted through [robbery], thereby curtailing the victim's potential as a purchaser of such goods.'" (quoting United States v. Elders, 569 F.2d 1020, 1025 (7th Cir. 1978))), overruled on other grounds by United States v. Harty, 930 F.2d 1257, 1263 (7th Cir. 1991).

19

robberies for which Hebert was convicted had the necessary impact on interstate commerce.[10]

Hebert's third insufficiency argument is that the government presented insufficient evidence to prove beyond a reasonable doubt that Hebert committed the robberies of the banks or the stores, or that he used a firearm in relation to any of these robberies.  The record clearly forecloses this argument. Viewing the considerable evidence in the record in the light most favorable to the government, we cannot say that no rational jury could have found Hebert guilty of any of the counts of conviction.

**D.    The Challenge Under the Fourth Amendment**

Hebert argues that his warrantless arrest at Alford's supermarket was without probable cause.  This court reviews de novo the "ultimate determination of Fourth Amendment reasonableness."

---

[10]    The evidence as to the amount each of the businesses lost in this case is similar to the evidence of amounts lost in the robberies analyzed in two other Hobbs Act cases in which convictions were upheld: the Fifth Circuit's decision in Miles with the Tenth Circuit's decision in Zeigler.

| Hebert | Miles | Zeigler |
|---|---|---|
| Hardee's $117 | McDonald's $1500 | Lucky Stop $800 |
| Popeye's (2) $500 total | McDonald's $3000 | Vickers gas $650 |
| Picadilly's $600 | Colter's $1300 | Apco Hudson $160 |
| A.J.'s Liquor $12,000 | Taco Bueno $1200 | Mazzio's Pizza $300 |
| Debb's Liquor $3500 | | Keith's Food $350-$500 |
| Mr. Gatti's $900 | | Rex's Chicken $1500 |

Miles, 122 F.3d at 236-37; Zeigler, 19 F.3d at 488.

United States v. Sinisterra, 77 F.3d 101, 104 (5th Cir.) (quoting United States v. Seals, 987 F.2d 1102, 1106 (5th Cir. 1993)), cert. denied, 117 S. Ct. 82 (1996).

Probable cause for a warrantless arrest exists when the totality of facts and circumstances within an officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed an offense. United States v. Wadley, 59 F.3d 510, 512 (5th Cir. 1995), cert. denied, 117 S. Ct. 240 (1996). Hebert argues that the police had no probable cause to arrest him when he walked out of the grocery store. After holding a hearing on Hebert's motion to suppress, the district court found, in pertinent part, the following facts supporting probable cause to arrest Hebert:

> First, [officer Holmes] knew that the robbery suspect had been exposed to red dye and that a red substance was on Hebert's hands. Second, he saw that Hebert, like the robbery suspect, was wearing black and white sneakers. Third, Hebert identified himself to them as the owner of the automobile matching general description of the robbery suspect's vehicle. Fourth, he had seen a red paint-like substance on portions of the car's interior. Fifth, Hebert had failed to respond forthrightly to some of his questions. Finally, the presence of an inflated tire behind the driver's seat of the car contradicted Hebert's claim the vehicle had a flat tire.

The testimony at trial supported these findings. The totality of facts and circumstances shows that the officers reasonably believed that Hebert had committed an offense. This court finds no error.

**E.   The Challenge to the Sentence**

The district court imposed the sentences for the second and subsequent convictions for use of a firearm in relation to a crime of violence under 18 U.S.C. § 924(c)(1)[11] consecutively to the sentences imposed for the other counts.  At sentencing, Hebert argued that this was an incorrect interpretation of 18 U.S.C. § 924(c)(1).  The district court overruled Hebert's objection.  Hebert was convicted of eleven counts of violation of section 924(c)(1); he received five years' imprisonment for the first conviction, and twenty years' imprisonment for each of the remaining ten convictions, to be served consecutively.  The district court's interpretation of a federal statute is a question of law that we review de novo.  United States v. Mathena, 23 F.3d 87, 89 (5th Cir. 1994).

Hebert admits that second or subsequent sentences under section 924(c)(1) are to be served consecutively to any other sentence imposed.  However, Hebert contends that the imposition of these subsequent consecutive sentences in his case is excessive because the enhancement results in an overall sentence of 215 years, despite the fact that Hebert is not a repeat offender, has

---

[11]   In pertinent part, section 924(c)(1) states:

> Whoever, during and in relation to any crime of violence . . . uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence . . ., be sentenced to imprisonment for five years . . . . In the case of his second or subsequent conviction under this subsection, such person shall be sentenced to imprisonment for twenty years . . . . [N]or shall the term of imprisonment imposed under this subsection run concurrently with any other term of imprisonment.

18 U.S.C. § 924(c)(1).

22

never injured anyone, never discharged his firearm, and stole only $36,000. Hebert argues that the word "conviction" in section 924(c)(1) is ambiguous and under the rule of lenity should be read to mean a "final judgment," so that consecutive sentences for second or subsequent convictions can be imposed only when a defendant's first section 924(c)(1) conviction becomes final. Hebert cites the dissent in <u>Deal v. United States</u>[12] to support of his reading of the statute.

The majority opinion in <u>Deal</u> does not help Hebert's argument. <u>Deal</u> held that the word "conviction" in section 924(c)(1) unambiguously "refers to the finding of guilt by a judge or jury that necessarily precedes the entry of a final judgment of conviction." <u>Deal v. United States</u>, 113 S. Ct. 1993, 1996 (1993). The majority did not accept the defendant's argument that such an interpretation would be unjust. <u>See</u> <u>id.</u> at 1999; <u>see also</u> <u>United States v. Miles</u>, 10 F.3d 1135, 1141 n.7 (5th Cir. 1993). The district court did not err in imposing consecutive sentences for the convictions under 18 U.S.C. § 924(c)(1).

## IV. Conclusion

The judgment of conviction and the sentence are affirmed.

<span style="color:red">ENDRECORD</span>

---

[12] 113 S. Ct. 1993, 1999-2004 (1993) (Stevens, J., dissenting).

DeMOSS, Circuit Judge, dissenting in part:

Hebert was sentenced to 2,581 months (215 years) in federal prison. Two-thirds of that term is attributable to Hebert's conviction under the seven counts of violation of the Hobbs Act, 18 U.S.C. § 1951(a), and the companion counts for use of a firearm under 18 U.S.C. § 924(c). Because I continue to believe that the Hobbs Act is being unconstitutionally applied by the federal government in cases like this one where cash is robbed from local retail merchants, my conscience requires that I write now again to set forth the reasons particular to this case for my continuing dissent.[13]

I.

First of all, I have to register my fundamental disagreement with the strategy adopted by the Department of Justice and the federal prosecutors which has produced this conviction. Following passage of the Hobbs Act in 1945, there is no published opinion from the Supreme Court or any United States Circuit Court for twenty-three years which addresses the circumstance of interference with commerce by robbery under the Hobbs Act. This period of utter

---

[13] This dissent is limited to Hebert's convictions under the Hobbs Act counts and the companion use of a gun counts. I concur as to his convictions under the bank robbery statutes and the use of a gun counts companion to the bank robbery counts.

silence as to the applicability of the Hobbs Act to any type of robbery certainly undercuts any argument that Congress intended to reach the type of robberies involved in this case.  The first case to reach the Courts of Appeal using the Hobbs Act as a basis for prosecution of a robbery was *United States v. Caci*, 401 F.2d 664 (2d Cir. 1968) (prosecution for conspiracy to commit robbery of hotel guest and armored car messenger), *vacated*, *Giordano v. United States*, 394 U.S. 310 (1969).  The first case in the Fifth Circuit to use the Hobbs Act as the basis for a robbery prosecution was *United States v. Pearson*, 508 F.2d 595 (5th Cir.) (prosecution of a conspiracy to rob the safety deposit boxes of a hotel in which valuables of interstate travelers had been deposited), *cert. denied*, 423 U.S. 845 (1975).  Thereafter, another nineteen years elapsed until *United States v. Martinez*, 28 F.3d 444 (5th Cir.), *cert. denied*, 513 U.S. 910 (1994), started a run of cases, all originating in the Northern District of Texas, in which armed robberies of local retail stores were prosecuted under the Hobbs Act and § 924(c).  These later cases are: *United States v. Davis*, 30 F.3d 613 (5th Cir. 1994), *cert. denied*, 513 U.S. 1098 (1995); *United States v. Collins*, 40 F.3d 95 (5th Cir. 1994), *cert. denied*, 514 U.S. 1121 (1995); *United States v. Gipson*, 46 F.3d 472 (5th Cir. 1995); *United States v. Laury*, 49 F.3d 145 (5th Cir.), *cert. denied*, 116 S. Ct. 162 (1995); *United States v. Parker*, 62 F.3d 714 (5th Cir. 1995), *opinion withdrawn and superseded on rehearing*, 73 F.3d 48 (5th Cir.), *rehearing en banc granted*, 80 F.3d 1042 (5th Cir. 1996), *opinion reinstated in part*, 104 F.3d 72 (5th Cir.),

25

*cert. denied*, 117 S. Ct. 1720 (1997); ***United States v. Robinson***, 119 F.3d 1205 (5th Cir. 1997); and ***United States v. Miles***, 122 F.3d 235 (5th Cir. 1997). ***Martinez***, ***Davis***, ***Collins***, ***Gipson***, and ***Laury*** were all decided prior to the Supreme Court's decision in ***United States v. Lopez***, 514 U.S. 549 (1995). The defendants in these cases have been hit with humongous sentences as a result of converting what has traditionally and legally been recognized as garden variety robberies under state law into violations of the Hobbs Act in order to bring to bear the draconian impacts on sentencing required by 18 U.S.C. § 924(c).[14] If the Hobbs Act can

---

[14] Martinez was convicted of five Hobbs Act counts and five companion use of a firearm counts. The opinion does not disclose his total sentence nor the amounts taken from each local retail store involved; but under § 924(c) he would have been sentenced to 1,020 months (85 years) on the firearm counts alone. *See Martinez*, 28 F.3d at 445.

Davis was convicted of four Hobbs Act counts and two companion use of firearm counts. The opinion does not disclose the amounts taken in each retail store involved but he was sentenced to a total of 457 months (38 years) on all counts. *See Davis*, 30 F.3d at 615.

Collins was convicted of two Hobbs Act counts and two companion use of firearm counts. The opinion does not disclose the amounts taken in each robbery but he was sentenced to a total of 550 months (46 years) on all counts. *See Collins*, 40 F.3d at 98. On appeal, his conviction on one robbery count and its companion firearm count was reversed requiring resentencing.

Gipson was convicted of a conspiracy count, three Hobbs Act counts and three companion firearm counts. The opinion does not disclose the amounts taken in each robbery but he was sentenced to a total of 750 months (62 years) on all counts. *See Gipson*, 46 F.3d at 473-74.

Laury was convicted on five Hobbs Act counts and five companion use of firearm counts. The opinion does not disclose the amounts taken in each robbery but Laury was sentenced to a total of 1,071 months (89 years) on all counts. *See Laury*, 49 F.3d at 148.

Parker was convicted of six Hobbs Act counts and two use of firearm counts and was sentenced to 430 months (36 years). His total take in the six robberies was less than $500. *See Parker*, 104 F.3d at 73 (DeMoss, J., dissenting).

Miles was convicted of four Hobbs Act counts and four use of a firearm counts and was sentenced to 859 months (71 years). The total take in the four robberies was $7,000. *See Miles*, 122 F.3d at 236-39.

Gustus was convicted of the same counts as Miles plus an additional Hobbs

26

be applied to all armed robberies which would otherwise have been prosecuted under state law, then the mandatory sentencing requirements of § 924(c) provide prosecutors with the opportunity to put the perpetrators of several of such robberies away for what amounts to life, as has occurred here in Hebert's case, even though the perpetrator had not previously been convicted of any crime, no shots were fired, and no victims sustained any physical injuries, and the sums of money taken in such robberies were less than $1,000. But if all armed robberies in the United States are to be prosecutable under the Hobbs Act there is a whole series of policy questions which in my view must be addressed by the Congress, as the legislative branch of our government, and not by the imaginative prosecutive theories of the executive branch nor by the lackadaisical decision making of the judicial branch. I have not been able to find anything in the U.S. Criminal Code which persuades me that the U.S. Congress has decided to make every armed robbery that occurs in the United States a federal offense and to appropriate the funds required to investigate, prosecute, determine guilt or innocence, sentence and incarcerate the greatly expanded

---

Act count and a use of gun count and was sentenced to 1,140 months (95 years). *See id*. at 236-39.

Robinson was convicted of three Hobbs Act counts and one use of a firearm count and was sentenced to 270 months (23 years). The total take in the three robberies was approximately $70,000. *See Robinson*, 119 F.3d 1209-09.

Hebert was convicted of seven Hobbs Act counts and seven companion use of firearm counts. His sentence attributable to these counts was 1,621 months and out of his total sentence of 2,581 months. His total take in the seven robberies was approximately $17,600 with four of the robberies involving takes of less than $1,000.

27

numbers of federal criminal defendants which would result from that policy decision.

## II.

The text of the Hobbs Act, as it now exists, reads as follows:

> (a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

The government prosecuted this case and the trial judge charged the jury on the theory that the Hobbs Act may be construed as if that statute read as follows:

> Whoever unlawfully takes or obtains by force or violence or by intimidation any personal property or thing of value from the person or presence of another (the "victim") when (i) such victim has at any time in the past bought anything of value from a seller in another state and (ii) such taking would deplete the assets of the victim so as to curtail in any way or degree the potential of such victim to make other purchases in the future from sellers in other states, shall be fined under this title or imprisoned not more than 20 years or both.

It is plainly obvious that the text of the Hobbs Act as it now exists in the U.S. Criminal Code does not say what the government claims it says. I have previously explained at considerable length why I believe nothing in the legislative history of the Hobbs Act, as it was passed 53 years ago, supports the expansive reading which the government contends applies in this case. Indeed, the legislative history demonstrates that the Act was passed to address

28

a very particular problem.  Members of labor unions were hijacking produce trucks carrying produce into union states for the purpose of requiring that the non-union driver either pay a "tribute" in the form of a union wage or allow a union driver to transport the produce into the union dominated state.  Thus, the Hobbs Act was passed to deal with robbery or extortion directed at goods *moving* in commerce.  The legislative history simply does not support the government's proposition that the Hobbs Act extends to prohibit purely local robberies.  Likewise, I have written extensively as to why this expansive reading of the Hobbs Act is in clear and fundamental conflict with the teaching of the Supreme Court in its landmark decision **United States v. Lopez**, 514 U.S. 549 (1995).  *See* **Miles**, 122 F.3d at 241-51 (5th Cir. 1997) (DeMoss, J., specially concurring).  I will not repeat all of those thoughts and comments here; but I think some points justify restatement because of their relevance to the issues raised in this case.

First, the Supreme Court has never held that the theory of "de minimis impact on interstate commerce" was sufficient to support the application of the Hobbs Act as asserted in this case.  Secondly, the Supreme Court has never held that the "depletion of assets theory" asserted by the government in this case was a proper way to measure an effect on interstate commerce.  I recognize, of course, that these theories have been accepted as legitimate readings of the Hobbs Act by several of the Circuit Courts; but in my view the rationale supporting these theories is so flimsy that sooner or later the Supreme Court must grant a writ of certiorari

to apply its teachings in *Lopez* to this strained reading of the Hobbs Act. In such event I predict that the Supreme Court will deliver the same fatal blow to the prosecutive theories in this case as it did in *United States v. McNally*, 483 U.S. 350 (1987) (reversing prosecutive theory that mail fraud and wire fraud statutes reach defrauding the citizens of a state of the intangible right to good government by officials) and as it did in *United States v. Bailey*, 116 S. Ct. 501 (1995) (reversing prosecutive theory that the word "use" in 18 U.S.C. 924(c) meant the same thing as "possession"). In both *McNally* and *Bailey* the Supreme Court held that in construing criminal statutes we should apply the common, ordinary meaning of the plain text of the statute as being the conduct which Congress intended to prohibit and leave it to the Congress to broaden and expand the language by amendment to the statutory language.

III.

In testing the correctness of the government's interpretation of the Hobbs Act in this case, I used the following premises as guidance:

1. The federal government does not have a general police power and, therefore, Congress cannot make a federal crime out of every robbery that occurs in the United States. *See Lopez*, 514 U.S. 549 (1995).

2. The sections of the U.S. Code which do make robbery a federal offense have been codified in Chapter 103 of Title 18 and define robbery as a federal offense in certain limited

30

circumstances specified in each of §§ 2111 through 2119 of that chapter. The four bank robbery counts of the indictment against Hebert in the present case are based on § 2113 which make it a federal offense to rob a bank, savings and loan, or credit union if those entities are insured by an agency of the federal government. However, none of the other sections of Chapter 103 would make it a federal offense to rob a retail merchant of cash in his cash register.

3.    The Hobbs Act, on the other hand, has been codified in another chapter of Title 18 of the U.S. Code, *i.e.* Chapter 95, entitled "Racketeering"; and § 1951, which contains the same language as originally passed by the Hobbs Act, is entitled "Interference With Commerce by Threats or Violence."

4.    The gravamen of the offense made criminal by the Hobbs Act (§ 1951(a)) is the obstructing, delaying, or affecting of commerce and the verbs used in the text -- "obstructs, delays or affects" -- are each in the present active tense.

5.    Both the term "commerce" and the term "robbery" are defined in the Hobbs Act and if we insert in subsection (a) of § 1951 the pertinent definitions, the text of subsection (a) would read as follows:

> Whoever in any way or degree obstructs, delays or affects commerce [between any point in a state and any point outside thereof] or the movement of any article or commodity in commerce [between any point in a state and any point outside thereof] by [the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will or by means of actual or threatened force], shall be fined under this Title

31

or imprisoned not more than 20 years or both. (Portions in brackets inserted.)

6. It is apparent, therefore, (i) that grammatically and logically the conduct defined as robbery in the Hobbs Act must be the producing cause of a delay, obstruction or effect on commerce between a point in one state and a point in another state and (ii) that the delay, obstruction or effect produced must occur contemporaneously with the conduct which constitutes robbery.

The government's interpretation of how the Hobbs Act should be read to support its application in this case makes several fundamental changes in the plain language of the statute as passed by Congress. First of all, the government's interpretation changes the gravamen of the offense from (i) "obstructing, delaying or affecting" commerce between a point in one state and a point in another state to (ii) the taking or obtaining of personal property from the person or presence of another by means of actual or threatened force. In order to find some constitutional basis for this redefinition of the offense, the government's interpretation purports to insert a definition of who the victim of the robbery conduct might be. It is important to note that in the text of the Hobbs Act as actually passed by Congress there is no definition of any kind as to the "person" from whose person or in whose presence the personal property is taken. Furthermore, the definition suggested by the government, *i.e.* a person who "has at any time in the past bought anything of value from a seller in another state" trivializes the connection with interstate commerce, which is the only constitutional power which could possibly support this

32

statute, and is so open-ended that it would permit the federal government to prosecute almost every robbery that occurs in the United States just as if the United States had been granted a general police power under the Constitution. Likewise, the "depletion of assets" theory which the government suggests as a rationale for establishing an effect on commerce trivializes the cause and effect relationship between the robbery and interstate commerce. That theory permits hypothetical, conjectural and conclusionary testimony about future events and effects, just as that offered in this case.

The depletion of assets theory is fraught with fallacies and suppositions. According to the dictionary the word "deplete" means "to decrease seriously or exhaust the abundance or supply of" something. Webster's College Dictionary 363 (1991). While it is certainly possible that the cash in the cash register of a retail merchant might constitute all of the assets of that merchant, that circumstance is so unlikely as to not be a reasonable inference absent specific proof of that circumstance. The assets of any business entity will consist of raw materials, goods in process, finished goods, manufacturing machinery, office equipment, display equipment, inventories of merchandise, account receivable, trucks and other rolling stock, bank accounts, and real property and improvements thereon. Ordinarily, the value of all of these assets will greatly exceed the amount of cash which the business keeps in its cash register. Furthermore, it is customary for businesses to carry insurance to protect all of its assets from loss -- by fire,

33

by windstorm, by burglary, by theft, or by robbery; and such insurance eventually replaces the value of an asset (but for deductibles) to the value that asset had before there was any loss. Consequently, to determine whether the impact of a robbery on the assets of a business were sufficient to actually constitute a "depletion of those assets" there would have to be proof of what the assets were before the robbery and what the assets were after the robbery and proof as to what insurance coverage was applicable. No such proof was offered by the government in this case and consequently the jury and the trial court could only speculate as to whether or not the robberies "depleted the assets" of the victims.

Likewise, the conclusional testimony in this case that the money taken in the robbery "would have been used" to purchase food and other commodities from another state cannot withstand rational analysis. Most businesses that make a lot of cash sales routinely limit the amount of cash in the cash registers by periodically transferring quantities of cash into safes located on the premises. From these on-premises safes, which can be opened only by specially authorized employees, the cash is regularly picked up and transmitted to a local bank where it produces a credit to the account of the retail merchant making the deposit and the cash itself becomes the property of the bank. It is this credit in its checking account that the retail merchant later draws on by check which is sent in payment of the bill from the out-of-state seller that ultimately produces payment for any out-of-state purchases.

34

There is only one circumstance when the cash in a cash register on the merchant's premises would be used to purchase goods from an out-of-state seller and that is when the retail merchant has ordered those goods to be delivered collect-on-delivery (COD). If the robbery occurred just before that COD delivery was to be made and the merchant then did not have the cash on hand to pay when the goods were delivered, then such out-of-state delivery and sale would have been "delayed, obstructed or affected" by the robbery. There was no testimony or proof whatsoever in this case that any such COD delivery was frustrated by the occurrence of the robbery. In fact, the majority opinion recognizes that none of the witnesses for the government "testified that the robberies caused them to forego, reduce or delay specific purchases from out of state." *Ante* at 11.

In reality, therefore, the government's theories of "de minimis effect on interstate commerce" resulting from "depletion of assets" and "frustration of potential future sales" are nothing but semantical camouflage intended to obscure the fact that the robberies in this case did not "obstruct, delay or affect" interstate commerce. For these reasons and for the additional reasons set forth in my dissent in **Miles**, I would hold that the Hobbs Act cannot be constitutionally applied to the robberies in this case and the convictions and sentences on those counts should be vacated and dismissed.

I respectfully dissent.